ORIGINAL

FILED
OCT - 5 2005
U.S. COURT OF FEDERAL CLAIMS

John Randall Jefferies (No. 011542)
FENNEMORE CRAIG, P.C.
3003 North Central Avenue
Suite 2600
Phoenix, AZ 85012-2913
Telephone: (602) 916-5000
Facsimile: (602) 916-5513
Email: rjefferi@fclaw.com

Attorneys for C.S. McCrossan, Inc.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

C.S. MCCROSSAN, INC.

v.

THE UNITED STATES; acting by and through the DEPARTMENT OF TRANSPORTATION and the FEDERAL HIGHWAY ADMINISTRATION

No. 05 1065 C

COMPLAINT

For its complaint, C.S. McCrossan, Inc. ("McCrossan") alleges:

GENERAL ALLEGATIONS

1. On or about January 18, 2000, McCrossan was awarded Contract No. DFTH68-00-6-00010 (the "Contract" or "Project") by the Federal Highway Administration, acting for and on behalf of the Department of Transportation and the United States (collectively, "FHWA"). The Project involved the reconstruction of approximately 6.79 miles of mountainous roadway north of Tucson, Arizona.

2. The original Contract amount was approximately $16,125,353.80 based upon estimated quantities.

3. The Contract required McCrossan to complete the work in 579 calendar days and provided for liquidated damages of $2,500 per day for unexcused, delayed completion. The Contract originally designated the time period from February 1 to May 31 as a restricted time period in which no work could be performed in certain locations due to the suspected presence of the Mexican Spotted Owl and Peregrine Falcons.

4. FHWA issued the notice to proceed and McCrossan started work on February 4, 2000. The original scheduled completion date was September 14, 2001.

5. During construction, the parties executed Modification No. 2 (attached hereto at Exhibit 1), which extended the Contract completion date by 129 calendar days to January 21, 2002 and paid McCrossan for certain compensable delays.

6. After executing Modification No. 2, McCrossan continued to encounter excusable and compensable delays. Those delays forced McCrossan to cease work due to encroachment into Owl/Falcon nesting periods and eventually into a time period where the Project was beset by wild fires so no work could be performed.

7. McCrossan achieved Substantial Completion, as defined in the Contract, and interpreted by the Contracting Officer, of its work on February 20, 2003. FHWA has assessed liquidated damages of $475,000. As set forth herein, McCrossan has

contested this assessment and is entitled to the remission of all liquidated damages.

8. On July 29, 2003 and August 10, 2004, McCrossan presented to the Contracting Officer several certified requests for equitable adjustments to both the Contract time and price. Copies of both claim letters are attached hereto as Exhibits 2 and 3, respectively, and incorporated herein by this reference.

9. On November 16, 2004, the Contracting Officer issued his final decision denying the claims. A copy of the final decision is attached as Exhibit 4, and incorporated herein by this reference.

10. Accordingly, this complaint is timely filed and this Court has jurisdiction over this matter pursuant to the Contract Disputes Act of 1978, 41 U.S.C. 609.

COUNT ONE

(Horizontal Drilling Overrun)

11. The Contract contained detailed summary sheets showing the quantities of horizontal and vertical blast holes for all stations that required blasting throughout the Project. In total, the Contract represented a total of 28,000 meters of vertical holes and 14,000 meters of horizontal holes, for a ratio of 2:1.

12. The Contract included line items for each type of blast hole and a unit price of $11.94/m for vertical and $14.37/m for horizontal blast holes.

13. Several months after the Project began, it became

apparent that FHWA's design and existing field conditions would not permit the amount of vertical drilling referenced in the Contract.

14. To complete the work, McCrossan was required to utilize horizontal drilling in those areas where vertically drilled holes were otherwise required by the plans.

15. There are critical differences between vertical and horizontal blast holes. In general, vertical blast holes leave a truer rock face, which greatly reduce the post-blast, slope scaling that McCrossan was required to perform by FHWA. Slope scaling is the trimming and removal of loose rocks on the face of the roadway side slope after the blasting has occurred. Horizontal blasting leaves large overhangs and many loose boulders in the face. The difference was exacerbated by unknown geological conditions discovered after the various blasts (natural fault lines that are undetectable during the blasting preparations, may extend beyond the planned limits of excavation causing more material to be loosened by the blasting than is necessary to bring the roadway prism to the planned width). At FHWA's direction, McCrossan was unexpectedly required to remove those overhangs and boulders with track hoes and breakers to create a stable slope. Many of these large boulders had to be broken by track hoes and breakers to be placed in fills.

16. Generally speaking, blasts using vertical holes cause the excavated material to rise and settle on the shoulder of the roadway. Horizontal shots cause the material to move latterly

across the road and down the adjacent slope. Horizontal shots also cause a greater amount of fly-rock (fly rock refers to boulders or portions of the rock mass loosened by blasting that break away from the bulk of the blasted material and land some distance away from their original location). In an effort to reduce fly-rock and facilitate the removal of the excavated material, horizontal shots are normally loaded with a lighter powder factor (less explosive), which again results in larger rocks that have to be broken mechanically to meet fill requirements. In general, horizontal blast holes require more labor and equipment and generate less volume of material in a given period of time as compared to vertical holes. Essentially, the daily rock excavation quantities go down with horizontal blast holes and the production costs per unit increase. The net result is an increased unit cost of excavation.

17. Additionally, horizontal drilling increased traffic congestion for both the traveling public and construction traffic and required increased survey costs. In most locations, the horizontal holes had to be precisely surveyed as to location and depth in an attempt to prevent overbreak.

18. During construction, the horizontal drill holes exceeded estimated quantities by over 300% and the vertical holes underran by 70%. These variances increased the resulting production cost of Roadway Excavation.

19. During the first five months of roadway excavation where the horizontal and vertical quantities and ratios were as

represented in the Contract (two vertical to one horizontal), McCrossan's actual excavation cost was $9.79 per cubic meter and the Contract unit price for Roadway Excavation was $15.45.

20. In the areas where the conditions were not as represented and the horizontal drilling overran, McCrossan's actual excavation cost was $22.66 per cubic meter.

21. The Variation in Estimated Quantities (VEQ) clause incorporated into the Contract allows for a 15% overrun or underrun without a price adjustment. Using this provision, McCrossan's current claim calculation would be reduced from 104,800 cubic meters of affected excavation to 89,150 cubic meters.

22. The increased production costs for Roadway Excavation due to the 28,125 meters increase in horizontal drill holes reflects a defect in the original bid documents and thus constitutes a constructive change under the Changes clause, a latent physical condition at the Project site under the Differing Site Conditions clause, and at a minimum a material and compensable increase under the Variation in Quantities clause.

23. Separate and apart form any recovery allowed under the VEQ clause, FHWA had a duty to exercise due and proper care in analyzing and determining the estimated quantities for the two types of blast holes. McCrossan is informed and believes that FHWA breached this duty and negligently estimated the anticipated quantities. Accordingly, FHWA misrepresented the actual quantities, which amounts to a constructive change and a breach

of contract. As a direct and proximate result, McCrossan's unit prices did not actually reflect the excavation costs to complete the work. McCrossan is entitled to an equitable adjustment to account for these price increases without the 15% adjustment referenced in the VEQ clause.

24. In addition, FHWA directed McCrossan to perform extra and additional work to account for these conditions, which constitutes a compensable change as well. The increased quantities and resulting additional and different work excusably and compensably delayed the Project.

25. To account for the related impacts to McCrossan's excavation costs, McCrossan is entitled to an equitable adjustment to its Contract in the amount of $1,281,250.22 under the VEQ clause or $1,348,776 (104,800 X 12.87 = 1,348,776.00) for FHWA's negligence, misrepresentation, and constructive change, without the 15% credit of the VEQ clause, plus an appropriate extension of Contract time and time related expenses to be proven at trial.

26. FHWA's failure and refusal to pay the increased costs or grant additional time amounts to a material breach of the Contract.

<u>COUNT TWO</u>

(Earthwork Overrun)

27. During construction, McCrossan also experienced a significant overrun in the Roadway Excavation quantities (item 20401). McCrossan has not been compensated for the actual work

performed and accepted by FHWA and is entitled to payment for such work under the Contract.

28. The increased Roadway Excavation quantities also required additional time to complete the Project and impacted McCrossan's planned method and sequence of construction, in part, by increasing the amount of excess excavation that had to be disposed of.

29. Upon completion, the FHWA instructed McCrossan to commission a field survey to determine actual and final quantities. McCrossan retained a survey firm known as AMEC to perform this analysis. During this process, AMEC personnel met with the FHWA to explain their methodology. The FHWA in turn hired RS Engineering to check AMEC's work. AMEC and RS have now agreed on a cross section measurement of 186,600 cubic meters for Roadway Excavation areas that they actually surveyed and cross-sectioned. However, an additional 28,287 cubic meters of excavation must be added to the cross section total for excavation areas not previously included. These areas include various cross roads, the foundation fills at the repair sites #1 and #2, and the .5' subexcavation in the rock cut areas of the subgrade. Adding these additional quantities to AMEC's cross-section quantities generates a total quantity of 214,887 cubic meters.

30. The Supplemental Contract Requirements (SCR) and Standard Specification FP 96, which were incorporated into the Contract, clearly confirm that these excavation areas should be

measured and paid as Roadway Excavation. The total Roadway Excavation completed by McCrossan was approximately 214,887 cubic meters. To date, FHWA has only paid for 172,484 cubic meters at $15.45/cubic meters for a total payment of $2,664,877.80. The quantity of 214,887 cubic meters would generate a payment of $3,320,004.15, for an unpaid difference of $655,126.35.

31. FHWA's failure to pay for these actual quantities, despite demand, amounts to a material breach of the Contract. McCrossan is entitled to recover the $655,126.35, plus interest.

COUNT THREE

(Compensable Delays)

32. To date, FHWA has withheld $475,000 from McCrossan as liquidated damages. Given the issues raised herein, and the time impacts of these events and conditions, McCrossan is entitled to additional Contract time that would more than offset these liquidated damages and result in additional payment to McCrossan for its extended overhead and fixed costs.

33. The time impacts referenced herein were not addressed in Modification No. 2. That modification was negotiated in the summer and signed in the fall of 2001. There were several issues that arose or were ascertained subsequently that entitle McCrossan to additional performance time and compensation. These issues are explained in detail in McCrossan's letter of August 2, 2002, which is attached hereto as Exhibit 5 and incorporated herein by reference. FHWA never answered this letter, yet continued to withhold liquidated damages.

34. In Modification No. 2, McCrossan reserved the right to claim for matters that were ascertained after the modification became effective. At that time, neither party was aware of the significant overrun in the earthwork quantities, the full impacts of the unsuitability of the Roadway Excavation for use as aggregates, disposal of the associated excess material, the final overrun of horizontal drilling, or their individual and collective impacts upon the Project.

35. After Modification No. 2, weather impacted several aspects of McCrossan's asphalt placement and construction of various concrete structures. McCrossan's time calculations in Modification No. 2 assumed that the weather would not impact its operations. The parties agreed that McCrossan would be given additional Contract time to account for delays resulting from weather.

36. In addition to weather, McCrossan also lost critical time due to extra work directed by FHWA including, but not limited to, modified slope construction to address dangerous conditions caused by unexpected geological conditions.

37. When the parties signed Modification No. 2, the earthwork summary showed that the upper portion of the Project should almost balance in terms of the embankment material required and excavation material available. Ultimately, the site conditions throughout the Project were such that McCrossan generated significantly more excess material (material in excess of the amount needed to construct the new roadway to the lines

and grades as designed). This excess was wasted by changing grades, flattening slopes and disposing of material offsite at the Helipad and Horseshoe sites. These unforeseen and differing site conditions and quantity overruns caused additional delays and additional expense.

38. Per FHWA's plans and specifications, McCrossan was to construct a containment berm and a turnout at Sollars Road, which is directly across from the quarry site (within the limits of the Project at approximate roadway station 30+00, there existed an area cut into the side slope that previously had been used as a source of raw material for the purpose of crushing rock into aggregates. The site was known as the "quarry site"). The berm and the turnout were constructed as per the plan and specification. Later, FHWA changed the configuration of the berm and the grade and alignment of the turnout. These changes delayed the paving through the quarry area and ultimately delayed completion.

39. At the San Pedro cut (station 28+100 to 28+200), McCrossan discovered a differing site condition in the form of unknown and unstable geological conditions that resulted in additional excavation and a roadway grade change performed under difficult conditions due to the limited work area and the need to maintain traffic. The conditions under which this additional excavation and embankment had to be performed significantly decreased McCrossan's efficiency and required additional time.

40. The San Pedro cut was the last segment of the roadway

to be excavated on the upper portion of the Project. McCrossan started blasting and excavating at San Pedro on September 10, 2001, and continued into October before any problems were encountered. On October 8, 2001, McCrossan's blasting consultant visited San Pedro to do post-blast reviews and prepare additional blasting plans for the forthcoming blasts. On this visit, he noticed that there was an unsafe overhang and fault line on the left side of the cut in an area that was not planned for excavation. He so noted this in a memo to McCrossan dated October 9, 2001. The memo included his recommendations and was forwarded to the FHWA that same day. The FHWA ignored the consultant's concerns and McCrossan continued the blasting and excavation through October. By the end of October, it became apparent to both McCrossan and FHWA project personnel that there was also an unsafe geological condition that existed on the right side of the roadway.

41. On November 20, 2001, the FHWA and McCrossan (including McCrossan's blasting consultant) met at San Pedro to discuss the conditions. McCrossan cited the unsafe condition on the left side and the unstable geological conditions on the right side of the roadway. The Project excavation had already exceeded planned quantities and the disposal of the excess material was considered to be under claim.

42. On November 29, 2001, the FHWA directed McCrossan's blasting consultant to provide a plan to deal with the unexpected conditions at San Pedro. On December 12, 2001, the consultant

submitted his recommendations to the FHWA and McCrossan.

43. But it was not until January 12, 2002 that the FHWA provided McCrossan with the direction required to deal with the differing and unsafe conditions at the San Pedro cut. McCrossan was required to perform additional excavation through this segment of the Project and then to raise the roadway grade to dispose of the excess material due to the geological failure.

44. After modifying its operations to account for this additional work, McCrossan placed the subbase, base course and first lift of asphalt by February 14, 2002.

45. The unexpected and differing geological site conditions discovered at San Pedro and FHWA's failure to timely consider and act upon the suggestion of McCrossan and the blasting consultant delayed the Project. In addition to this initial delay, there was extra work performed and time lost to effectuate the FHWA's directives and changes to revise the design grade of the roadway and the adjacent slopes.

46. FHWA also made several design changes to such items as armor plating ditches, extending and relocating rundowns, extending guardrail, adding guardrail end treatments and other changes that also contributed to the post-Modification No. 2 delays.

47. In addition, Modification No. 2 allows for adjustments in Contract time if weather affects the productivity of critical activities such as paving. McCrossan was impacted by adverse weather after Modification No. 2, which delays are excusable and

compensable.

48. FHWA's assessment of liquidated damages also fails to account for the fact that McCrossan had placed the required one lift of pavement by February 14, 2002 and had obtained substantial completion as contemplated by Modification No. 2. In addition, FHWA has wrongfully assessed liquidated damages even though the work was stopped on February 14, 2002 due to the owl/falcon restrictions. Given the compensable delays after Modification No. 2, it is not only improper to assess liquidated damages for owl/falcon restrictions during 2002, but that shut down is itself compensable.

49. In addition, FHWA's directive that McCrossan suspend operations in February 2002 for the Owl/Falcon restrictions amounts to a change, an act of interference with McCrossan's operations, and a breach of FHWA's duty to cooperate. Notably, the subject birds were not even protected species. Accordingly, FHWA had an affirmative obligation to take the steps necessary to allow McCrossan to continue working. FHWA's failure to do so renders the directive to suspend operations compensable.

50. The owl/falcon restriction lasted from February 14 through May 31, 2002. Due to the protracted cessation of its operations, McCrossan was forced to essentially demobilize in order to mitigate losses that were accruing for idle equipment and manpower. Forest fires then delayed the project until July, 2002. When McCrossan started work in July 2002, FHWA made numerous changes that added additional work, which also delayed

final completion.

51. In light of the foregoing, McCrossan is entitled to an equitable adjustment to the Contract time and price to reflect an additional 210 calendar days, the remission of all liquidated damages, and extended overheads and fixed costs of no less than $327,010 due to the delays described herein under Modification No. 2, the Default, Variation in Quantities, Changes, and Differing Site Conditions clauses of the Contract, breaches of the duty to cooperate as well as the events and conditions described in the previous counts.

52. FHWA's failure to pay these amounts and continued assessment of liquidated damages constitute a material breach of the Contract.

COUNT FOUR

(Foundation Fill)

53. As bid, the Contract included two areas that were known as repair areas #1 & #2. Repair section #1 was located at station 16+000 and repair area #2 was located at station 20+660 to station 20+960.

54. Both of the repair areas had previously been flooded and washed out. The prior emergency repair consisted of a loosely dumped fill of large rocks and earthen material and temporary pavement to facilitate traffic. The Contract required the reconstruction of these repair areas incorporating the use of MSE walls to contain the roadway embankment rather than earthen fill slopes. FHWA considered the previously constructed

emergency fill to be an unacceptable foundation for the MSE wall and the Contract required the fill to be removed and recompacted.

55. The Contract included a line item for Foundation Fill. FHWA's plans tabled and quantified some of the potential foundation fill areas. Repair areas #1 & #2 were not included on this table. However, the Contract's supplemental conditions (page I-67, section 208.04) states: "Locations of foundation fill shown on the plans are for contingency. Actual locations and quantities will be determined by the CO."

56. It is well documented in partnering meetings and correspondence that McCrossan considered the repair sections to constitute Foundation Fill and assumed that FHWA would pay for this work at the Foundation Fill unit price.

57. Having been advised of McCrossan's position, the FHWA indicated it would monitor and measure this particular area as foundation fill. After McCrossan completed repair area #2, FHWA then stated that the foundations in these repair areas was incidental work and would not be measured at all for payment purposes. When McCrossan protested, FHWA agreed with the completed quantities for this work but would only pay for the work as Roadway Excavation ($15.45/cubic meters) instead of Foundation Fill ($24.29). McCrossan accepted this partial payment but reserved its rights to pursue this issue as a claim.

58. The FHWA and McCrossan had agreed to the quantity of 14,924 cubic meters for this work.

59. This foundation work was clearly a Foundation Fill and

not Roadway Excavation. McCrossan is entitled to the difference in unit prices for these two items ($8.84) for the accepted quantities of 14,924 cubic meters, or $131,928.16.

60. FHWA's failure to pay this amount constitutes a material breach of the Contract.

COUNT FIVE

(Quarry Claim)

61. The plans, specifications and the earthwork summary included in the Contract represented that the contractor would be able to produce subbase and MSE wall backfill from the roadway excavation. McCrossan reasonably relied upon the Contract indications and assumed that there were sufficient quantities of suitable materials to produce the required aggregates from the Roadway Excavation. This was consistent with the requirement of specification section 205.06, which states: "Conserve suitable material for manufacturing (including crushing) select granular backfill material from the roadway excavation."

62. After the notice to proceed, McCrossan mobilized its crushing equipment and started crushing MSE wall backfill from Roadway Excavation in the spring of 2000. But when this material was tested it did not meet the minimum Contract requirements for resistance to wear as determined by the LA abrasion test. Other areas of roadway excavation were crushed with similar results. This presented a secondary problem because the abrasion specification for the roadway subbase material was the same as the wall backfill. As a result, FHWA advised McCrossan that the

materials excavated and processed through its Roadway Excavation did not meet the specifications for roadway subbase or MSE wall backfill. This was a critical assumption of the Project plans and McCrossan's bid.

63. In addition to the MSE wall backfill and subbase, McCrossan bid the Project to produce item 30101E, Aggregate Base Course ("ABC"), from the Roadway Excavation given the Contract indications on quantity, quality, and location of suitable material that would be generated through Roadway Excavation. Because the LA abrasion specification was the same for base course and subbase, McCrossan reasonably assumed the Roadway Excavation also would generate sufficient suitable materials and make ABC.

64. The Earthwork Summary Table contained within the Contract represented that the Roadway Excavation would result in 10,500 cubic meters of excess materials that were not required for fill. Although the earthwork summaries and other Contract indications represented that this material would be suitable for wall backfill, subbase, and ABC, the Contract paid for the work associated with handling and disposing of this excess material under the "Waste" line item.

65. McCrossan rightfully and reasonably based its bid on these Contract indications and concluded that the excess material would be as represented, and therefore, would be suitable for the production of aggregates that met the Contract requirements.

66. When McCrossan discovered that the Roadway Excavation

FENNEMORE CRAIG, P.C.
PHOENIX

was not as represented and would not meet the Contract specifications, McCrossan incurred additional cost and time impacts associated with locating an alternative material source and disposing of the excess, unsuitable material. Essentially, for every yard of material from the Roadway Excavation that was not available for use as base course, ABC or MSE wall backfill, McCrossan incurred the cost of excavating an equal volume of material from the alternative source.

67. McCrossan considers the discovery of unsuitable materials within the roadway excavation to constitute a differing site condition and a breach of the implied warranty of suitability and accuracy.

68. As discussed previously, there was a Forest Service quarry within the project limits that had been used to produce suitable aggregates on prior FHWA projects in the area. This area was not made available to the bidders by FHWA in the bid documents.

69. McCrossan proposed that FHWA allow it to use this quarry site to make the aggregate products that were otherwise assumed to come out of the Roadway Excavation. This proposal mitigated some of the time and cost impacts that would have been incurred due to the changed conditions if this option had not been pursued. Even though the FHWA agreed, McCrossan never waived its right to be compensated for the time and cost impacts that resulted as a consequence of this differing site condition and breach of warranty.

70. After the FHWA granted McCrossan access to the quarry, McCrossan had to blend material excavated at the quarry with Roadway Excavation to meet the LA Wear requirements. As noted, all of this was at significant extra cost to McCrossan. Later, FHWA revised and relaxed the LA Wear requirements for the subbase and MSE walls.

71. As confirmed by AMEC's cross-section of the quarry, McCrossan was forced to excavate 30,935 cubic meters to produce the necessary aggregates. This excavation involved equipment and methods similar to those used to perform the work associated with the Contract line item for Roadway Excavation. McCrossan is entitled to payment of $477,945.75 for the excavation performed in the quarry once access was granted by FHWA (30,935 @ $15.45).

72. In addition, adding 30,935 cubic meters of excavation at the quarry alters the FHWA's Earthwork summary, which is tabled on sheet 26 of the Project plans. The excavation quantities as-planned generate an excess of 10,553 cubic meters per the referenced table. Increasing the total excavation by 30,935 cubic meters and adjusting the table accordingly would generate an excess of 10,553 plus 30,935 or 41,538 cubic meters. The Contract Line Item for Waste is $2.45 per cubic meter. McCrossan has not been compensated for the 30,935 cubic meters of additional waste generated as a result of the changed conditions and is entitled to $75,790.75 for the work associated therewith.

73. The discovery of these differing site conditions adversely impacted McCrossan operations and delayed the Project.

74. McCrossan is entitled to additional time and compensation to account for the unexpected discovery of unsuitable Roadway Excavation materials under the Differing Site Condition clause of the Contract, as well as for a breach of the implied warranties of accuracy and suitability.

75. In addition to the increased Waste quantities referenced above, at certain times McCrossan was forced to haul a significant amount of excavation off of the Project to the area known as the "Horseshoe". Once the material was placed in that area, FHWA directed that it be placed in a manner that was acceptable to the Forest Service. This change required crushing a portion of the material down to a size that made it suitable for plating the disposal site. This amounted to a change that is compensable under the "Changes" clause of the Contract.

76. Due to the increased excavation, McCrossan was unable to dispose of all of the excess excavation (Waste) within the limits of the Project. A portion of the excess was transported out side of the Project limits to an area controlled by the United States Forest Service known as the "Horseshoe". Although this area was closer to the project than alternative disposal sites, the Forest Service required that the material be crushed down and utilized to plate the fill area as a condition of use, which was a change to the contract. The cost of crushing is a direct and proximate result of the changed conditions and related disposal requirements. McCrossan is entitled to an equitable adjustment of $53,567.44 for this work.

77. FHWA's failure to pay the $607,303.94 that is due amounts to a material breach of the Contract.

78. FHWA's failure to pay amounts to a material breach of the Contract.

COUNT SIX

(Curb Backfill)

79. The Project plans show a bituminous taper behind the guardrail. During construction, the FHWA deleted this taper and directed McCrossan to backfill behind guardrail and curb. That work was completed as directed.

80. The Contract clearly states that this curb backfill will be paid for by the cubic meter.

81. Despite demand, FHWA has failed to pay for approximately 1700 cubic meters of Curb Backfill that was placed and accepted.

82. FHWA's failure to pay the $34,221.00 that is due amounts to a material breach of the Contract.

COUNT SEVEN

(Topping Material)

83. The Project was in the mountains and essentially was considered a rock excavation job. On projects involving rock excavation, excavation and plating of the top portion of the subgrade with finer material in order to facilitate finishing of the subgrade is necessary.

84. In section 204.04 of the Contract special requirements, three different paragraphs address the use of some sort of

topping material. The first paragraph states that the asphalt pavement and base course will be saved to use as topping in rock cut areas. Paragraph 5 states that the contractor will conserve material meeting the specification for select topping material from Roadway Excavation to use for roadway topping. Paragraph 7 also states that the contractor will furnish and place aggregate base course as directed by the CO in rough and rocky subgrade areas.

85. As noted above, McCrossan produced subbase, MSE wall backfill and aggregate base on the Project. These materials were produced by crushing and screening, which also produced both prescreening and crusher fines. When McCrossan ran out of material to plate the rock cut, it was forced to use these processed crusher fines as topping material. Approximately 5,000 cubic meters of this material was used to top off the 6" over-excavation areas.

86. These crusher fines had a fair market value of $6.00/cubic meters. McCrossan is entitled to $30,000 for the crusher fines used to plate the rock cuts.

87. FHWA's failure to pay these amounts constitutes a material breach of the Contract.

WHEREFORE, McCrossan requests that the Court enter judgment against defendant as follows:

A. Award McCrossan the principal amount of no less than $3,526,016, plus interest pursuant to applicable federal law;

B. Enter a finding that McCrossan has been excusably and

compensably delayed and order the remission of all liquidated damages, plus interest;

C. Award of all attorneys' fees and costs incurred herein;

D. Provide such further relief as the Court deems just or proper.

DATED this 4th day of October, 2005.

FENNEMORE CRAIG, P.C.

By [signature]
John Randall Jefferies
Attorneys for C.S. McCrossan, Inc.

ORIGINAL and 7 copies
sent via Federal Express
this 4th day of October, 2005 to:

Clerk, U.S. Court of Federal Claims
717 Madison Place, NW, Room 103
Washington, DC 20005

Kathy Powers
1678319

**VERIFICATION**

I, Joseph McCrossan, individually and on behalf of C.S. McCrossan, Inc., declare under penalty of perjury that the foregoing Complaint is true and correct to the best of my knowledge, information, and belief.

Executed this 26 day of September, 2005.

Joseph McCrossan

07/23/2002 TUE 16:11 FAX 623 _36 4445 C.S. McCrossan Inc. →→→ RAND_ JEFFERIES 002/003

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | | |
|---|---|---|---|
| 1. CONTRACT ID CODE | | PAGE 1 | OF PAGES 2 |
| 2. AMENDMENT/MODIFICATION NO. SA0002(Supuplemental Agreement) | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) AZ-PFH 39-1(6) |
| 6. ISSUED BY CODE<br>Federal Highway Administration<br>Central Federal Lands<br>555 Zang St, #259<br>Lakewood, Co 80228-1010 | | 7. ADMINISTERED BY (If other than Item 6) CODE | |

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

C. S. McCrossan, Inc.
100 South 76th Drive
Phoenix, AZ 85043

CODE | FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

✓ 10A. MODIFICATION OF CONTRACT/ORDER NO. DTFH68-00-C-00010

✓ 10B. DATED (SEE ITEM 13)

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

Net Increase to X415050-0-415054-160400D 2040391006HO of $

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

✓ C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-4 Changes (Aug 1987)

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

See Continuatin Sheet.

By signing in block 15 below, the Contractor agrees that payments and time adjustments as contained herein releases the Government from any and all liability under this contract from any further compensation or adjustments attributavble to this modification.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER (Type or print)<br>James M Larson for Joe McCrossan<br>Joseph McCrossan, Vice President | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
| 15B. CONTRACTOR/OFFEROR<br>James M Larson<br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>9/18/01 | 16B. UNITED STATES OF AMERICA<br>BY ______<br>(Signature of Contracting Officer) | 16C. DATE SIGNED |

PREVIOUS EDITION UNUSABLE
This form was electronically produced by Elite Federal Forms, Inc.

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

Sep 18 01 04:01p SW Division- Las Cruces 505-525-2492 p.1

# CONTRACT MODIFICATION

| STANDARD FORM 30 CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE | OF | PAGES |
|---|---|---|---|---|
| | SA0002 (SupplementalAgreement) | 2 | | 2 |

NAME OF OFFEROR OR CONTRACTOR
C.S. McCrossan

Line 14 continued

(1) Due to delays as referenced in C.S. McCrossan letter dated February 23, 2001, the contract time is hereby extended by one hundred (100) calendar days. Due to delays resulting from the nesting of the spotted owl the contract is here by extended twenty nine (29) calendar days, in accordance with special contract provision 108.03.

The revised project completion date will be January 21, 2002 as a result of this modification. It is agreed that the additional time granted and price adjustments listed below, are full consideration for all time-impacts and delays experienced to date, including the work restrictions due to Falcon and Owl nesting areas and all other delays associated with construction and contract administration issues as of this date. It is also understood that time is of the essence in completing this project. Consequently, liquidated damages will not preclude the government from issuing a notice of default for late completion, if it becomes apparent that the allowable contract time for substantial completion, as adjusted herein or hereinafter will be exceeded by more than 14 days. It is intended that the revised completion date will be considered a substantial completion date, and that the Government intends to enforce this completion date using all contractual means, including default, if the project is not substantially completed by the revised date. There will be consideration given if all other work is completed as scheduled, all grade is ready for placement of pavement and weather subsequently prevents paving, placement of concrete curb, or seeding /landscape operations from progressing. In this case an adjustment in time may be determined to be appropriate, but only if all other work has been completed and the contractor is making every effort to complete the pavement and concrete curb placement or seeding/landscape when temperatures and weather conditions are such that the specifications can be met. Weather, except unusually sever weather, will not be excuse for failure to complete all construction other than pavement, and concrete curb placement or seeding /landscape, according to the revised schedule. Subject to McCrossan's rights to an extension of time after this modification, Owl and Falcon restrictions for year 2002 will not be considered a cause for further time extensions. Nothing contained herein shall be considered as a waiver of McCrossan's rights under the contract for events, acts, or conditions arising as discovered after this modificatin.

(2) A lump sum Item, 15102 Unrecovered contractor overhead, is hereby added to the contract. A negociated price will increase the contract amount by $252,700.00

(3) Item 64527A, Sand For Winter Maintance, is here by added to the contract. A nogociated lump sum price of $7,280 will increase the contract amount by $7,280.00

(4) Item 15101 Mobilization, the lump sum amount is hereby increased by $15,000.00. This shall be full payment for requireing the contractor to demobilize and remobilize a rock crusher at the Rose Canyon Lake site.

(5) Item 20430A special overhaul, is hearby added to the contract to in an attemt to assist the contractor to continue embankment activities on the upper portion of the project, thus increasing the likelihood of pavement being completed prior to winter weather, which would preclude paving operations. This item shall increase the contract amount by $11,250.00.

Total increase to the contract amount is $286,230.00
Total increase to the contract time is 129 days

This form was electronically produced by Elite Federal Forms, Inc.

C.S. McCrossan, Inc.

100 South 76th Drive, Phoenix, Arizona 85043
Phone: 623/936-1486 • Fax: 623/936-4445

July 29, 2003

Mr. Randy Everett
Construction Operations Engineer
Federal Highway Administration
555 Zang Street, Room 259
Lakewood, CO 80228-1010

Subject: Project PFH 39-1(6), General Hitchcock Highway

Dear Mr. Everett:

C.S. McCrossan, Inc., hereby submits the following claim for additional compensation and the release of all liquidated damages in connection with work performed by McCrossan on Project PFH 39-1(6), (the "Project").

1. Earthwork Overrun - During construction, McCrossan experienced a substantial overrun in the quantity of work associated with pay item 20401 Roadway Excavation. McCrossan has not been compensated for the actual work performed in a timely manner and has incurred additional costs in its attempt to secure payment. Performance of the additional work also has required additional time to complete the Project. Significant impacts to the planned method and sequence of construction resulted as a direct consequence of these changed conditions. It should be noted that neither McCrossan nor the Engineer was in a position to determine the actual excavation quantities until completion.

Upon completion, the FHWA instructed McCrossan to commission a field survey to determine how much excavation had actually been done. McCrossan retained AMEC to perform the survey. After they had done some of the work and generated some quantities, AMEC personnel met with the FHWA to explain their methodology. The FHWA had concerns about the quantities so they hired RS Engineering to check AMEC's work. AMEC and RS have now agreed on a cross section measurement of 186,600 M3 for the areas that were actually surveyed and cross-sectioned. However, an additional 38,287 M3 of excavation must be added to the cross section total for excavation areas not previously included. These areas include the cross roads, the foundation fills at the repair sites #1 & #2, and the .5' sub cut in the rock cut areas of the subgrade. Adding these additional quantities to AMEC's cross-section quantities generates a total quantity of 214,887 M3. FP 96 clearly confirms that these excavation areas should be measured and paid as additional roadway excavation. This would bring the total roadway excavation to approximately

214,887 M3. To date, FHWA has only paid for 172,484 M3 at $15.45/M3 for a total payment of $2,664,887.80. The quantity of 214,887 M3 would generate a payment of $3,320,004.15. The difference is $655,126.35. In addition to this amount, FHWA also owes approximately $71,179 for waste related activities. As originally designed by FHWA, the project would have generated a surplus of excavated material. Contract Line Item 20402, "Waste", was established to compensate the Contractor for disposing of the excess material. With the substantial overrun in the volume of excavation, the quantity of waste also increased proportionately. In order to dispose of the increased waste, McCrossan was forced to haul a great deal of the excavation off of the project to the area known as the "Horseshoe". Once the material was placed in that area, FHWA directed that it be placed in a manner that was acceptable to the Forest Service. This required crushing a portion of the material down to a size that made it suitable for plating the disposal site. The extra work required to crush the additional waste material would not have been necessary if not for the changed conditions, 35% increase in the estimated quantities associated with the earthwork balance, and the misrepresentation in the bid documents concerning the suitability of the Roadway Excavation for the production of aggregates.

In order to place a value on this portion of the claim we have broken it down into two parts, (1) crushing of the material and (2) hauling and grading of the approximate quantity of Waste taken to the Horseshoe site. Given the nature of these two impacts, we do not have specific cost data tracking all aspects of these impacts. We estimated the actual impacts using 15 working days of activity with 1 crew member and an equipment complement of 1 track-mounted jaw crusher and 1 six cubic yard loader that was actually used to perform this work. The 15 days is based upon an estimate of the actual time that was required to complete this work.

| | |
|---|---|
| Crushing: Estimated Cost ~ | $22,179.00 |
| Hauling & Placing ~ 20, 000 m3 Waste @ $2.45 = | $49,000.00 |

For point of reference, when you consider the combined operations of the Roadway Excavation and the Waste activities, the actual cost increases for the affected activities approximates the amounts due using the unit bid prices and the actual quantities.

Therefore, McCrossan is entitled to an additional payment of $726,305.35 due for the increased quantities for these line items.

2. Foundation Fill-As bid, the project included two sections to reconstruct and two sections that were known as repair areas #1 & #2. The reconstruction areas were from stations 15+300 to 18+290. This was identified as the "lower section" since it was at a lower elevation than the other reconstruction section. The section known as the "upper section" was located from station 25+660 to 33+500. Repair section #1 was located within the lower section at station 16+000. Repair area #2 was located between the lower section and the upper section at station 20+660 to station 20+960.

Both of the repair areas had been previously flooded and the roadways had been washed out. The emergency repair consisted of loosely dumped fill of large rocks and earthen material and temporary pavement to facilitate traffic. The reconstruction of these repair areas was to be accomplished by using MSE walls to contain the roadway embankment rather than earthen fill slopes. The previously constructed emergency fill was considered to be an unacceptable foundation for the MSE wall and was to be removed and recompacted per the plans.

FHWA's plans tabled and quantified some of the potential foundation fill areas. Repair areas #1 & #2 were not included on this table. The FHWA has cited this omission as somehow supporting its position that this work was not a foundation fill. But this position ignores the language of the SCR's (page I-67, section 208.04), which states: "Location of foundation fill shown on the plans are for contingency. Actual locations and quantities will be determined by the CO."

It is well documented in partnering meetings and correspondence that McCrossan considered this work as foundation fill and assumed it would be paid for this work under this bid item.

The FHWA has taken several different positions on this issue. Before we started the first foundation fill it was our understanding that FHWA was going to monitor and measure this particular area as foundation fill. After we completed repair area #2 we were told that the FHWA considered this as incidental work. We protested and asked to escalate this decision. As a result of this escalation, it was determined that the FHWA agreed with the quantities but they would pay for the work as Roadway Excavation instead of foundation fill. In an effort to keep the project moving we agreed to this partial payment but reserved our rights to pursue this issue as a claim.

In connection with this issue, FHWA retained Kumar and Associates as the Geotechnical Engineer to advise it on the construction of the foundation for Repair Areas #1 & #2. Kumar's memorandum dated 12/20/2000 confirms that this was in fact a foundation fill. This memo shows that the recompacted fill was done strictly to provide an acceptable foundation for the walls. We have attached a copy of that memo for your convenience.

The FHWA and McCrossan have agreed to the quantity of 14,924 m3 for this work. The only question concerns the basis of payment. The FHWA has paid for the work at the unit price for Roadway Excavation ($15.45), for a total of $230,575.80. McCrossan contends that this work was clearly a Foundation Fill not Roadway Excavation. The unit price for Foundation Fill is $24.29, which would generate a payment of $362,503.96. The amount of this claim would be the difference between the two sums, or $131,928.16.

3. Quarry Claim - The plans, specifications and the earthwork summary provided in the solicitation represented that the Contractor would be able to produce subbase and MSE wall backfill from the roadway excavation. This was consistent with the requirement of

specification 205.06, which states: "Conserve suitable material for manufacturing (including crushing) select granular backfill material from the roadway excavation."

McCrossan mobilized crushing equipment and started crushing MSE wall backfill from roadway excavation in the spring of 2000. But when this material was tested it did not meet the minimum Contract requirements for resistance to wear as determined by LA abrasion test. Other areas of roadway excavation were crushed with similar results. This presented a secondary problem because the abrasion specification for the roadway subbase material was the same as that for the wall backfill. As a result, FHWA advised McCrossan that we could not use the roadway excavation for roadway subbase or MSE wall backfill.

In addition to the MSE wall backfill and subbase, McCrossan bid the job to produce item 30101E, Aggregate Base Course, from the roadway excavation. Because the LA abrasion specification was the same for base course and subbase, McCrossan reasonably assumed the roadway excavation would also make base course. The Earthwork Summary Table contained within the Bid Documents listed 10,500 meters as Waste. The Waste material was designated to become the property of the Contractor. McCrossan logically concluded from the Bid Documents that the Waste material would be as represented, and therefore, would be suitable for the production of aggregates that met the contract requirements. McCrossan based its bid on these indications by the Owner in the Bid Documents.

When the roadway excavation was not as represented, McCrossan incurred additional cost and time impacts associated with locating an alternative material source and disposing of the excess material. Essentially, for every yard of material from the Roadway Excavation that was not available for use as Base Course, Aggregate Base or MSE wall backfill, McCrossan incurred the cost of excavating an equal volume of material from the alternative source.

As you are aware, there was an area within the project limits that had been used previously for the quarrying of materials used to produce aggregates. This area was not made available to the bidders in the Bid Documents. We later learned that the materials previously produced from this source met the quality requirements for the current Contract. We proposed that FHWA allow us to use this quarry site to make the aggregate products that were to otherwise come out of the roadway excavation. McCrossan believes that this proposal served to mitigate some of the time and cost impacts that would have been incurred due to the Changed Condition if this option had not been pursued. Even though the FHWA agreed to this proposal, McCrossan never waived its right to be compensated for time and cost impacts that resulted as a consequence of this differing site condition.

As confirmed by AMEC's cross-section of the quarry, McCrossan was forced to excavate 30,935 M3 to produce the necessary aggregates. This excavation involved equipment and methods similar to those used to perform the work associated with the Contract Line Item for Roadway Excavation. In pricing this aspect of its claim McCrossan has treated the Excavation at the quarry and the additional waste as extensions of the respective Contract

Line Items. McCrossan is requesting payment of $477,945.75 for this aspect of the work (30,935 @ $15.45).

In addition, the 30,935 M3 of Roadway Excavation that would have been used to produce acceptable aggregate, now became excess material. This material was disposed of in numerous ways and in numerous locations. Despite the fact that the disposal cost was much greater than the $2.45 bid for item 20412 Waste, McCrossan requests that it be paid for these quantities at the Contract Bid price of $2.45 per cubic meter for a total of $75,790.75.

The total value of this claim is $553,736.50

4. Curb Backfill -The project plans show a bituminous taper behind the guardrail. John Carver, the project C.O, deleted this taper. The guardrail had to be placed as soon as the subgrade was built and before any pavement was placed. This made it impractical to pave a taper behind the posts and rail at a later date. Mr. Carver's solution was to pave up to the front of the guardrail posts and eliminate the bituminous taper. At a later date the guardrail and the curb would be backfilled, which would eliminate the need for the taper. By the time McCrossan completed the backfill around the guardrail and the curb as directed, Mr. Carver had been removed from the project. Barbara Quintana, who was the C.O., denied payment for this work supposedly because the bituminous taper had not been placed. But Mr. Carver's direction was provided prior to Ms.Quintana's arrival on the project. In any event, the taper would have been covered by backfill material as per the typical section. The plan and specification clearly state that curb backfill will be paid for by the cubic meter. Approximately 1700 M3 of Curb Backfill was placed to backfill the guardrail and curb that has not been paid for.

Value 1700 X $20.13 = $34,221.00

5. Topping Material-This project was in the mountains and by anybody's standard would be considered a rock job. On projects involving rock excavation, plating of the top portion of the subgrade with finer material in order to facilitate finishing of topping material is most always desirable. In section 204.04 of the SCR's three different paragraphs address the use of some sort of topping material. The first paragraph states that the asphalt pavement and base course will be saved to use as topping in rock cut areas. Paragraph 5 states that the contractor will conserve material meeting the specification for select topping material from roadway excavation to use for roadway topping. Paragraph 7 also states that the contractor will furnish and place aggregate base course as directed by the CO in rough and rocky subgrade areas.

On this project we milled the existing roadway and used it along with the existing base course to carry traffic and plate rocky cuts. We conserved any material that was suitable to use as topping material. On a couple of occasions John Carver directed us to use

aggregate base to plate the roadway to facilitate traffic. Yet we still ran short of topping material. This project had over 60,000 m2 of roadway that was in rock cut areas. At six inches of subgrade excavation and prepartion10,000 m3 of additional excavation is generated. McCrossan believes that it should be compensated for this work at the Contract unit price for Roadway Excavation. We used all available and suitable material to backfill and top these areas. But there simply was not enough material available.

As noted above, McCrossan produced subbase, MSE wall backfill and aggregate base on the project. These materials were produced by crushing and screening. These operations produced both prescreening and crusher fines. When we were out of material to plate the rock cut we were forced to use these processed products as topping material. Approximately 5,000 M3 of this material was used to top off the over-excavation areas. We asked for but never received payment for this item.

If in fact this processed material was not available and there was no acceptable topping material available from the excavation it is our opinion that the FHWA would have had to compensate us by change order or by using aggregate base to top out these rocky subgrade areas. Therefore we are asking for what we believe to be fair market value for this material.

Value 5000 m3 X $6.00 = $30,000.00

6. <u>Compensable Delays</u> - As of this date, FHWA has withheld $475,000 from McCrossan as liquidated damages. McCrossan believes that FHWA has violated the terms and conditions of the Contract by assessing liquidated damages given McCrossan's entitlement to adjustments in contract time for the numerous changed conditions affecting the project. Despite our requests, FHWA has not provided any written explanation as to how the contract time was calculated to arrive at this assessment. Given the issues raised herein, and the time impacts of these events and conditions, McCrossan clearly is entitled to additional contract time that would more than offset these liquidated damages and result in additional payment for the extended general conditions.

The time impacts referenced herein were not addressed in Modification No. 2. That Modification was negotiated in the summer and signed in the fall of 2001. There were several issues that arose or were ascertained subsequently that entitle McCrossan to additional performance time and compensation. These issues are explained in detail in McCrossan's letter of August 2, 2002. I have attached a copy for your convenience. It is important to note that this letter was never answered yet the FHWA continued to withhold liquidated damages.

Per the terms of Modification No. 2, McCrossan resolved only certain time related issues. We reserved the right to claim for matters that were ascertained after the Modification became effective. At that time, neither party was aware of the significant overrun in the

earthwork and consequently the full impacts of the unsuitability of the roadway excavation for use as aggregates, the final overrun of horizontal drilling and their impact upon the project.

After the execution of Modification No. 2, weather impacted several aspects of the asphalt placement and construction of various concrete structures. Our time calculations in Modification No. 2 assumed that the weather would not impact our operations. We agreed that we would be given additional contract time to account for delays resulting from weather related delays.

In addition to the post-modification weather impacts, McCrossan also lost critical time due to extra work performed at the direction of FHWA including, but not limited to, modified slope construction to address dangerous conditions caused by unexpected geological conditions. Also, the differing site conditions at the San Pedro cut resulted in additional excavation performed under very difficult conditions due to the limited work area and the need to carry traffic. The conditions under which the additional excavation had to be performed led to significant lost efficiency and additional time. We believe all of these impacted McCrossan's operations subsequent to the execution of Modification No. 2 and entitle McCrossan to no less than 100 additional working days as well as additional compensation.

The San Pedro cut and the manner in which the related changed conditions were handled by the FHWA is the most significant impact to the project subsequent to the signing of Modification No. 2. The San Pedro cut was the last roadway cut left on the upper project. From 9/12/01 to 10/04/01 several small blasts were set off at San Pedro. These blasts were used to build an access road so that drilling equipment could get to the top of the cut. After the road was pioneered, Bob Cummings (Blasting Consultant) came to the site on 10/08/01 to measure and photograph the site so that he could develop a blasting plan. On 10/09/01 Jerry James, our Project Manager, received a memo and a blasting plan from Mr. Cummings. This memo expressed his concern that even though the left side of the cut was not intended to be excavated it was unsafe and should be laid back. FHWA did not accept Mr. Cumming's opinion. Accordingly, we continued with the blasting, excavating and pioneering through October and early November. On November 20th McCrossan again told the FHWA that we felt the left side of the cut at San Pedro was dangerous and that they should look at it. Mr. Cummings was on the job that day and he was asked by the FHWA to look at the cut. He reiterated his opinion that he had expressed in his 10/09/01 memo that yes, it was dangerous.

On 11/21/01, Mr. Cummings sent a memo confirming his concerns about the safety of the cut. He also suggested an excavation method that would enable us to remove the material on the left and keep traffic flowing. On 11/28/01, the FHWA requested that the blasting consultant review the cut on the right side of the roadway at San Pedro. On 11/29/01, Mr. Cummings was on site to review and make recommendations as how we should proceed with the cut. On 12/12/01 we received his recommendation and passed it on to the FHWA. Still no decision was made as to how the FHWA wanted us to handle this changed and unexpected geological condition. Almost a month later (1/09/02), Mr. Cummings was asked

to visit the site and meet with the FHWA geotechnical representative, Mr. Khamis Haramy, and review the cut one more time. The next day Mr. Cummings sent us a memo with the suggestions he and Khamis Haramy had agreed upon. We were now able to go ahead with our work. Although the blasting and excavation was weather impacted, it was completed by the end of January. The subbase, base course and first lift of asphalt was placed by the 14th of February.

Given the unexpected geological site conditions discovered at San Pedro, if FHWA had timely considered and followed Mr. Cummings' suggestion to remove the slide area on left side of the San Pedro cut, the Project would not have been delayed by over a month. In addition to this delay, there was extra work performed and time lost to effectuate the FHWA's directives in this area to lay back the slopes on the left and right sides of the roadway. McCrossan's analysis indicates that, at a minimum, these issues delayed completion by 50 days.

In addition to this impact there were several other impacts for which additional time should have been granted. When we signed Modification No. 2, the earthwork summary showed that the upper job should balance or possibly be somewhat short as far as the embankment material needed and excavation material available. As it turned out, we generated over 6,000 m3 of excess material, excluding San Pedro, that had to be dealt with. This excess was wasted by changing grades, flattening slopes and disposing of over 3,000 m3 at the helipad site. This unforeseen differing site condition caused additional delays and additional expense.

Per the plans and specifications, McCrossan was to construct a containment berm and a turnout at Sollars Road, which is directly across from the quarry site. The berm and the turnout were constructed as per the plan and specification. Later, FHWA changed the configuration of the berm and the grade and alignment of the turnout. These changes delayed the paving through the quarry area.

Other changes such as armour plating ditches, extending and relocating rundowns, extending guardrail, adding end treatments and other changes also added to the delays. These issues may seem minor but given the strict interpretation of the language of Modification No. 2 they become significant.

In addition to the items affecting Contract completion discussed above, McCrossan believes that FHWA should consider that we were forced to endure an ever-changing Administration Team for FHWA at the project level. The constant changes in personnel assigned to the project made it very difficult, if not impossible, to maintain any continuity of communication. This circumstance certainly did not serve the interests of either party.

When reviewing the time of completion, FHWA also should consider the fact that the specific language of Modification No. 2 allows for adjustments in Contract Time if weather

affects the productivity of critical activities such as paving. McCrossan believes that this was exactly the case, and as such it is entitled to an adjustment of Contract Time.

The FHWA's time calculations also have failed to account for the fact that McCrossan had placed a minimum of 1 mat of pavement by February 14 and had obtained substantial completion per our discussions prior to signing Modification No. 2 and our interpretation of the language of the Modification. Despite that fact, it appears that FHWA has started charging McCrossan liquidated damages even though the work was stopped on February 14, 2002 due to the owl/falcon restrictions. Given the compensable delays after Modification No. 2 referenced above, it is not only improper to assess liquidated damages for falcon restrictions during the 2002, but that shut down is itself compensable.

It is our position that FHWA's directive that McCrossan suspend operations in February 2002 amounts to a change, an act of interference with our operations, and a breach of FHWA's duty to cooperate. As of that time, it is our understanding that the subject birds were not even protected species. Accordingly, FHWA had an affirmative obligation to take the steps necessary to allow McCrossan to continue working on the project. Its failure to do so renders the directive to suspend operations compensable.

The owl/falcon restriction lasted from February 14 through May 31, 2002. The fires then delayed the project until July. Once we started work in July 2002, FHWA made numerous changes that added additional work. We estimate that this delayed our final completion by 50 days.

Overall, it is our position that McCrossan is entitled to an additional 150 working days for the significant amount of additional work associated with the substantial overruns in Roadway Excavation, Waste and Horizontal Drilling, the post-Modification impacts from inclement weather, the changed conditions at the San Pedro cut, and the numerous changes and additions to the work performed after we were allowed to return to the project following the Forest fires that took place in 2002. McCrossan estimates that its fixed costs related to this Project are $43,601 per month. Given McCrossan's entitlement to 150 working days subsequent to the signing of Modification No. 2, McCrossan is requesting the remission of all liquidated damages and compensation of $327,010.00 for its extended overhead.

7. Based upon the foregoing, McCrossan hereby demands that the FHWA immediately pay McCrossan ***$2,278,201.01 plus*** the appropriate amount of interest and an extension of time necessary to abate the liquidated damages.

McCrossan respectfully request that you issue a final decision on this claim. The undersigned certifies that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which McCrossan believes the government is liable. I am authorized to certify this claim on behalf of McCrossan.

If you have any questions or comments regarding this matter, please contact my office at 623-936-1486.

Sincerely,

Joseph McCrossan

**C. S. McCrossan Construction, Inc.**

neral Contractors

Box 1717 • Las Cruces, New Mexico 88004 • 505/523-2686 • FAX 505/525-2492

August 10, 2004

Mr. Randy Everett
Contracting Officer
U. S. Department of Transportation
Federal Highway Administration
Central Federal Lands Highway Division
555 Zang Street # 259
Lakewood, CO 80228

RE: CONTRACT DTFH68-00-C-00010 GENERAL HITCHCOCK HIGHWAY (Mt Lemmon)

Dear Mr. Everett:

As we have previously advised FHWA, C. S. McCrossan, Inc. has been analyzing the additional costs associated with the 300% quantity overrun for horizontal drilling that we experienced on this project. McCrossan hereby requests a change order in the amount of $1,281,250.22 pursuant to the Changes and Variations in Quantities clauses of the contract.

To complete this work, McCrossan was forced to utilize horizontal drilling in those areas where vertically drilled holes were otherwise contemplated by the plans. The Contract included line items for payment of each method of drilling by the linear meter. The Contract unit prices for those line items were $11.94 for vertical and $14.37 for horizontal blast holes. FHWA's measurement and payment of the horizontal blast holes at the higher unit price confirms its concurrence with the method used for each blast.

In addition to our discussions regarding the other outstanding claim issues on the project. we have spent the last several months attempting to analyze the various impacts that the horizontal blast hole overrun had on our operations and costs. The costs were felt predominantly in McCrossan's production cost of roadway excavation. We ultimately decided that using a measured mile was the most appropriate way to examine the impacts.

Obviously there are critical differences between vertical and horizontal blast holes. The difference is exacerbated by unknown geological conditions discovered after the various blasts. In general, vertical drilling leaves a truer face, which greatly reduced the post-blast scaling that McCrossan was required to perform by FHWA. Horizontal blasting leaves large overhangs and many loose boulders in the face. These overhangs and boulders had to be scaled with track hoes and breakers to ensure a safe slope surface. Many of these large boulders had to be later broken by track hoes and breakers to be placed in fills.

Blasts using vertical holes and charge time delays tend to cause the excavated material to rise and then settle on the shoulder of the roadway. Horizontal shots cause the material to move latterly across the road and down the adjacent slope. Horizontal shots also cause a greater amount of fly-rock. In an effort to reduce fly-rock and facilitate the removal of the excavated material, horizontal shots are normally loaded with a lighter powder factor, which again leads to larger size material that has to be broken later to meet fill requirements. In general, horizontal blast holes require more labor and equipment and generates less volume of material in a given time as compared to vertical holes. Essentially, with the same, and sometimes greater equipment requirements, for a particular area, the daily excavation quantities goes down with the use of horizontal blast holes and the costs increase. The net result is an increased unit cost of excavation.

Additionally, horizontal drilling increased traffic congestion in certain circumstances and required increased survey costs. The horizontal holes had to be surveyed as to location and depth of hole to try to prevent overbreak.

To determine the impacts upon on the Roadway Excavation unit costs, we had to determine if there was an area where the ratio of vertical to horizontal drilling was reasonably consistent with the quantities indicated by FHWA in the Contract Documents. We believe the period from 1 April 2000 to 1 September 2000 is a representative baseline for this calculation. During this time, there were 89 roadway production shots and the FHWA measured and paid for 44,678 cubic meters of excavation. This would equate to approximately 500 cubic meters per shot. The FHWA measured and paid for 5763 meters of vertical blast holes and 2742 meters of horizontal blast holes during this time span. This ratio of vertical to horizontal is almost identical to the bid quantities and the assumptions the FHWA made in calculating these anticipated quantities. During this base period, McCrossan's actual roadway excavation costs was $ 9.79 per cubic meter.

We then performed the same calculations for the time period from 2 September 2000 to 1 March 2002. During this time frame there were 277 roadway production shots. The blasting related excavation quantity was approximately 104,800 cubic meters. This would equate to approximately 380 cubic meters per shot. I would note that the FHWA paid for approximately 128,000 cubic meters of roadway excavation during this time frame but 22,900 cubic meters were not related to blasting (the two repair sites and the slope slide at Sycamore Canyon). For the blast quantities, the FHWA measured and paid for 2,766 meters of vertical blast holes and 40,015 meters for horizontal. Based on the ratio of vertical to horizontal blast holes in the bid schedule the anticipated quantity of

horizontal holes should have been approximately 9,250 meters and the anticipated quantity of vertical holes should have been 18,500 meters. Focusing solely on this particular time period, the increase was actually 430%. And McCrossan's actual production costs for this amount of excavation was $21.55 per cubic meter.

The difference between the unit cost of blasting related excavation performed for that portion of the project where the ratio of the two drilling methods was consistent with the quantities in the Contract versus that portion where there was a large overrun of horizontal drilling is $11.76 per cubic meter. To perform this calculation and create an apples to apples comparison of these two time frames McCrossan has reduced the cost of the roadway excavation by $353,805 to take into consideration the non blasting related roadway excavation. The sum of $353,805 was arrived at by multiplying the 22,900 cubic meters of non blasting related excavation by the bid unit of $15.45. We also reduced the roadway excavation cost by the amount of the "quarry claim" ($545,950.00) and the amount of "waste and crushing claim" at the Horseshoe ($82,000.00).

The Variation in Quantities clause allows for a 15% overrun or underrun without a price adjustment. Therefore the quantity 104,800 cubic meters of affected excavation would be reduced to 89,150 cubic meters.

McCrossan believes that the increased production costs of the roadway excavation due to the 28,125 meters increase in horizontal drill holes reflects a defect in the original bid documents and thus a constructive change, a latent physical condition at the project site under the differing site conditions clause, and at a minimum a material and compensable increase in the estimated quantities and the related impacts to our costs. Based on the analysis of unit costs for excavation discussed above, McCrossan hereby requests an adjustment to its Contract of $1,281,250.22 (89,150 x $11.76) plus 10 % overhead, 10 % profit and 1 % bond.

We intend to discuss this matter with FHWA at the Settlement Conference on August 13. In the meantime, if you have any questions or comments concerning this issue, we will be happy to discuss them with you by telephone.

**McCrossan respectfully request that you issue a final decision on this claim. The undersigned certifies that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which McCrossan believes the government is liable. I am authorized to certify this claim on behalf of McCrossan.**

Sincerely,

Charles Gaasland

02/02 '05 16:10 NO.234 03/03

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Mr. Joseph McCrossan
C.S. McCrossan, Inc.
100 South 76th Drive
Tolleson, AZ 85353

Dear Mr. McCrossan:

Subject: Final Decision on Claim for Additional Compensation
Claim No. XVI-04-002, AZ PFH 39-1(6), General Hitchcock Highway
Contract No. DTFH68-00-C-00010

This is the Contracting Officer's final decision with regard to the above referenced claim for additional compensation. This decision is being issued in accordance with the provisions of the Disputes clause of the contract, FAR 52.233-1.

## I. THE CONTRACT

On January 18, 2000, the Federal Highway Administration (FHWA or Government) awarded to C.S. McCrossan, Inc. (McCrossan or the Contractor), Contract No. DTFH68-00-C-00010, a fixed-unit-price variable quantity contract in the amount of $16,125,353.80 for the construction of Arizona PFH 39-1(6), General Hitchcock Highway. The contract provided for the construction of 10.923 km of roadway including construction of grading, drainage and asphalt concrete pavement. The project is located entirely in the Coronado National Forest in the mountains northeast of Tucson, Arizona.

The contract cited to the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects FP-96 (FP-96), and incorporated the Federal Acquisition Regulations (FAR) contract clauses for construction, Labor Standards Provisions, Special Contract Requirements (SCR), Bid Schedule, and Plans.

The solicitation and invitation for bids were issued on November 8, 1999. Amendment 1 to the solicitation was issued on December 3, 1999, Amendment 2 to the solicitation was issued on December 8, 1999 and Amendment 3 to the solicitation was issued on December 9, 1999. Bids were opened at 1 p.m. on December 15, 1999, in the Federal Highway Administration's Division office in Phoenix, Arizona. McCrossan submitted the lowest of five responsive bids, which ranged from $16,125,353.80 to $20,056,057.50.

The contract was awarded on January 18, 2000. The Notice To Proceed letter was issued on February 4, 2000. On-site work commenced on February 14, 2000. The contract completion date was September 14, 2001. Time extensions granted during the course of the project revised the contract completion date to February 14, 2002. Final Acceptance was achieved on April 9, 2003.

Five Supplemental Agreements (SA) were executed during the course of the project to date:

SA No. 1, dated November 20, 2000, compensated the contractor for placing a 1600 mm by 1075 mm pipe arch culvert at station 18+290 in lieu of the 1200 mm pipe culvert required by the contract. This modification also changed the headwall design, added a temporary traffic signal system, and approved the Contractor's use of the rock quarry located right of station 29+900 – 30+00 as a material source. This modification also stated that any waste resulting from use of the quarry is McCrossan's responsibility and will be disposed of off the project at no additional cost to the government. No time was added by this modification.

SA No. 2, dated October 19, 2001, increased contract time by 129 calendar days to January 21, 2002 and compensated the contractor for costs associated with the time increase. The additional time granted and cost adjustments are full consideration for all time-impacts experienced to date, including the work restrictions due to the presence of the Mexican Spotted Owl during the summer months of 2001, time to gain access to a materials source, and for time impacts associated with overruns in horizontal drilling. The additional costs are for unrecovered contractor overhead, sand for winter maintenance, mobilization, and special overhaul. This modification also stated that the revised completion date will be considered the substantial completion date and that weather, except unusually severe weather, and restrictions due to the presence of the American Peregrine Falcon and Mexican Spotted Owl for year 2002 will not be considered causes for further time considerations. Modification 2 also states that weather, except unusually severe weather, will not be excuse for failure to complete all construction other than pavement, and concrete curb placement or seeding/landscape.

SA No. 3, dated July 15, 2002, compensated the contractor for repairs made to the slide area between station 30+570 right and station 30+690 right. Work included reconstructing the cut slope, processing the excavated material, drifting the fine material on the rock slopes and at the base of the retaining walls between station 27+600 and station 33+600, placing the coarser material in the fill section between station 30+670 left and station 30+800 left, and extending the outlet of the 750 mm pipe culvert at station 30+734. This modification added 24 calendar days to the contract.

SA No. 4, dated June 17, 2003, compensated the contractor for changes made to the seed mix including the addition of bonded fiber matrix. No time was added by this modification.

SA No. 5, dated June 16, 2003, deleted the planting of Government furnished container stock and compensated the contractor for cutting the guardrail posts to be flush with tops of the blocks. No time was added by this modification.

## II. THE CLAIM

McCrossan has submitted four letters regarding the claim. Summaries of the letters are listed below and include time requested and the amount claimed for each issue. The Contracting Officer's Final Decision addresses the most current version of the various claims which are included in McCrossan's letters dated July 29, 2003 and August 10, 2004.

| Letter Date | Issue | Amount Claimed | Time/Liquidated Damages/Extended Overhead Claimed |
|---|---|---|---|
| January 21, 2003 | Roadway Excavation | $699,436.95 | Release of all LD's |
| (attachment 1) | Liquidated Damages | $390,000.00 | |
| | | $1,089,436.95 Total | |
| April 9, 2003 | Roadway Excavation | $883,657.25 | 100 days time + |
| (attachment 2) | Foundation Fill | $131,919.32 | Release of all LD's + |
| | Quarry | $545,950.00 | Extended Overhead |
| | Curb Backfill | $34,221.00 | |
| | Topping Material | $30,000.00 | |
| | Horizontal Blast Holes | $305,000.00 | |
| | Liquidated Damages | $475,000.00 | |
| | Extended Overhead | $162,500.00 | |
| | | $2,568,247.57 Total | |
| July 29, 2003 | Roadway Excavation | $726,305.35 | 150 Days Time + |
| (attachment 3) | Foundation Fill | $131,928.16 | Release of all LD's + |
| | Quarry | $553,736.50 | Extended Overhead |
| | Curb Backfill | $34,221.00 | |
| | Topping Material | $30,000.00 | |
| | Liquidated Damages | $520,000.00 | |
| | Extended Overhead | $327,010.00 | |
| | | $2,323,201.01 Total | |
| August 10, 2004 | Horizontal Blast Holes | $1,281,250.22 | 0 Days Time |
| (attachment 4) | | $1,281,250.22 Total | |

The claim and accompanying certification met the requirements of FAR Clause 52.233-1, Disputes.

The claim alleges the following:

| Issue | Description | *Amt. Claimed |
|---|---|---|
| Quarry | McCrossan is due additional time and costs associated with developing and using a quarry as an alternative material source and disposing of the excess material, | $553,736.50 |
| Roadway Excavation | McCrossan has not been compensated for all roadway excavation performed, | $726,305.35 |
| Foundation Fill | Material used to support MSE walls at the two repair sites is incorrectly classified and paid for as roadway excavation instead of foundation fill, | $131,928.16 |
| Curb Backfill | McCrossan has not been paid for backfill that was placed to backfill the guardrail and curb, | $34,221.00 |
| Topping Material | McCrossan has not been paid for using processed materials as topping materials, | $30,000.00 |
| Horizontal Blast Holes | McCrossan has not been compensated for time and costs impacts related to using more horizontal drilling than represented in the contract, and | $1,281,250.22 |
| Liquidated Damages | McCrossan has been incorrectly assessed liquidated damages and is also entitled to compensation for an additional 150 working days after work was able to resume, remission of all liquidated damages in the amount of $520,000.00, and $327,010.00 for extended overhead. | $847,010.00 |
| | **TOTAL AMOUNT CLAIMED:** | **$3,604,451.23** |

* Claimed amounts are from McCrossan's letters dated July 29, 2003 and August 10, 2004.

## III. FINDINGS AND DETERMINATION

**Quarry**

McCrossan states that the plans, specifications and the earthwork summary provided in the solicitation represented that subbase and MSE wall backfill could be produced from the roadway excavation material. In addition to the MSE wall backfill and subbase, McCrossan claims to have bid the job to produce aggregate base course from the roadway excavation. Because the LA abrasion specification was the same for base course and subbase, they assumed the roadway excavation would also make base course. McCrossan assumed that the total quantity of material required by the solicitation to meet the LA Abrasion specification was 89,586 m3 (cubic meters). This quantity consists of the following:

| | |
|---|---|
| 35,226 m3 | subbase |
| 23,240 m3 | aggregate base |
| 31,120 m3 | select granular backfill |
| 89,586 m3 | TOTAL |

Of this quantity, 47,060 m3 is represented in the plans as being available from roadway excavation. This quantity is arrived at by adding the 15,940 m3 shown on sheet 26 of the plans as subbase available from roadway excavation to 31,120 m3 of select granular backfill shown on Sheet 94 of the plans. While select granular backfill (MSE Wall backfill) is not listed as a pay item it is shown in the cross sections that the backfill is derived from roadway excavation. Therefore, although it is not entirely clear that the design intended for the select backfill to come from on-site material, the FHWA will concede that it is reasonable that the contractor interpreted it this way. The remaining 42,526 m3 of material, however, is not represented in the contract as being available from roadway excavation and is material that McCrossan was responsible for providing. This quantity is arrived at by adding the remaining 19,286 m3 of subbase to the planned aggregate base quantity of 23,240 m3. McCrossan's assumption that the aggregate base course and the entire quantity of subbase could be processed from excavated material is not substantiated by information represented in the plans, specifications, or geotechnical report.

McCrossan mobilized crushing equipment in the spring of 2000 and the crushing of the MSE Wall backfill from roadway excavation material began shortly thereafter. McCrossan states that this material did not meet the minimum Contract requirements for resistance to wear as determined by the LA abrasion test. The Claim states that other areas of roadway excavation were crushed with similar results and that the FHWA advised them that material from roadway excavation could not be used for subbase or MSE Wall backfill. The FHWA did not advise McCrossan that they could not use roadway excavation for subbase or MSE Wall backfill. This is an inaccurate paraphrase of the Contract requirements. The Contractor is required to provide material that meets compliance test standards. The Government's responsibility is to inspect materials to insure their compliance with the Contract. It is McCrossan's responsibility to provide the required materials.

When the quality of the material from roadway excavation was not as McCrossan expected, the Claim states that they had to locate an alternative material source. There existed a quarry within the project limits that had been used previously for the quarrying of materials used to produce aggregates. The Claim states that McCrossan later learned that the materials previously produced from this source met the quality requirements for the current Contract. McCrossan proposed that the FHWA allow them to use this quarry site to make the aggregate products that were to otherwise come out of the roadway excavation. The Claim alleges that this proposal served to mitigate some of the time and cost impacts that would have been incurred due to the purported changed condition if this option had not been pursued. The Claim also states that for every yard of material from the Roadway Excavation that was not available for use as Base Course, Aggregate Base

or MSE wall backfill, additional costs were incurred from excavating an equal volume of material from the alternative source and wasting the corresponding quantity of material from roadway excavation.

McCrossan's schedule dated March 20, 2000, indicates that blasting, excavating, and processing operations were scheduled to start on April 11, 2000. They requested use of the quarry during the partnering meeting held on April 4, 2000; one week prior to the start of the above operations. During that same partnering meeting McCrossan stated that Speedie (materials testing subcontractor) still needed to obtain samples and run gradation with pictures for each cut section. During the April 20, 2000 partnering meeting, McCrossan requested permission to transport a sample from the loose material in the quarry to the crusher site, crush it, and test it for quality. They also stated that they would like to discuss using the quarry for material with the Forest Service and the FHWA should the sampled material test acceptably. McCrossan was given verbal approval to sample and test the material during the April 25, 2000 partnering meeting. Notes from the May 3, 2000 partnering meeting indicate that the FHWA requested a proposal (survey and cross section) from McCrossan for using the quarry. The material tested acceptably and McCrossan's proposal to use the quarry was received on July 21, 2000 and on August 15, 2000 the Forest Service granted them permission to use the quarry for the production of additional material and also listed their mitigation measures for using the quarry, 26 days after McCrossan requested use of the quarry. McCrossan was granted permission to use the quarry in Modification 1, dated November 20, 2000. This modification also states that should use of the quarry generate excess prism material, it shall be McCrossan's responsibility to dispose of any excess material off the project at no cost to the government. To reduce McCrossan's reliance on the quarry, the FHWA waived the LA Abrasion requirement for subbase and MSE wall backfill in March 22, 2001, approximately two months before McCrossan started placing subbase material on the grade.

McCrossan faxed to the FHWA on August 1, 2001, a summary of results for LA Wear and Soundness tests they had performed. The LA Abrasion requirement per Subsection 703.05 of the FP-96 is 50% maximum. Listed below are the LA Abrasion test results:

| Date | Location | Lab | LA Abrasion |
|---|---|---|---|
| January 20, 2000 | Stockpile | Speedie | 35 |
| May 9, 2000 | Sta 31+860 | Speedie | 48 |
| May 9, 2000 | Crusher Stockpile | Speedie | 40 |
| June 15, 2000 | Unknown | Speedie | 21 |
| June 15, 2000 | Sta 31+860 | Speedie | 57 |
| June 15, 2000 | Sta 30+940 | Speedie | 58 |
| June 22, 2000 | Unknown | Speedie | 23 |
| July 21, 2000 | S/P @ Palisades | Speedie | 48.2 |
| December 7, 2000 | Sta 18+135 | Speedie | 67.4 |
| December 7, 2000 | Sta 16+440 | Speedie | 47.8 |
| April 11, 2001 | Sta 31+250 | Precision | 48.1 |
| April 11, 2001 | Sta 20+880 | Precision | 45.5 |

| | | | |
|---|---|---|---|
| June 14, 2001 | Quarry Site | Precision | 48 |
| July 13, 2001 | AB from Quarry | Precision | 37.5 |
| July 18, 2001 | AB from Quarry | Speedie | 37.4 |

The FHWA stated on page A-3, Block 9, of the solicitation that the Materials Report could be viewed at FHWA's Lakewood, Colorado, office. Also listed is a contact and phone number (Mr. James Klamerus, Construction Operations Engineer) should the contractor have any technical questions about plans and specifications. No questions were asked concerning the quantity and quality of material available from roadway excavation. The FHWA produced a report titled "Materials Investigation and Soil Survey" in August 1985. Addendum 0003 to the solicitation discarded the Materials Investigation and Soil Survey report dated August 1985, and replaced it with a copy of more current reports. This report, Report 99-05, dated July, 1999, Retaining Wall Foundation Investigation, states on page 14, under the section titled Subbase Aggregate, that three proposed rock cutslopes were sampled and tested for use as subbase aggregate. Listed below are the cutslope locations and results of the LA Abrasion test as shown in Report 99-05:

| | |
|---|---|
| Sta 30+030 to 30+110 | LA Abrasion = 53 |
| Sta 32+100 to 32+150 | LA Abrasion = 43 |
| Sta 32+385 to 32+425 | LA Abrasion = 45 |

Based on indications in the contract and McCrossan's findings with respect to material quality, they have not substantiated that they could not have produced the quantity of material the contract represents as coming from roadway excavation. Furthermore, McCrossan requested use of the quarry before the start of blasting, excavation, and processing operations; and before they had tested materials from the project for LA Abrasion. At this time they did not know the quality or quantity of material that could be obtained from roadway excavation.

Per Subsection 103.01, Intent of Contract, the Contractor is responsible for providing all labor, material, equipment, tools, transportation, and supplies necessary to complete the work according to the contract. As required by the contract, the Contractor is responsible for locating a source for materials that are not shown as coming from materials produced on the project. The contract documents did not list the quarry as a potential material source. Subsection 105.01 of the FP 96 states:

> "The Contractor shall notify the CO of all proposed sources before delivery to the project to expedite material inspection and testing."

Subsection 105.02, Local Material Sources, states:

> "Sources of rock, sand, gravel, earth, or other natural material located by the Government in the vicinity of the project may be identified in the contract. These identified sources may be listed as provided for the project or only listed as

information to aid the Contractor in locating a source. The decision to use an identified source is solely that of the Contractor."

Subsection 105.02 (c), Contractor-located sources, states:

> The Contractor is responsible for these sources, including established commercial sources. Use sources that fulfill the contract quantity and quality requirements. Determine the quantity and types of equipment and work necessary to select and produce acceptable material. Secure all permits and clearances for use of the source and provide copies of the documents."

Subsection 105.02 (c) also states:

> The Contractor is to provide laboratory test reports and available historical performance data indicating that acceptable material is available from the source. Do not use material from a source that is unacceptable to the Government. Dispose of unacceptable material and locate another source at no cost to the Government."

With respect to McCrossan's assertion that the lack of quality material comprises a differing site condition, sufficient notice was not provided as required by FAR Clause 52.236-2, Differing Site Conditions. Nor has the Contractor shown (1) how the alleged lack of quality material differed from what was represented in the Contract, as discussed above; nor (2) how it differed from what a reasonable contractor would anticipate.

McCrossan also states that the 10,500 m3 of waste listed on the Earthwork Summary Table contained within the Bid Documents was designated to become the property of the Contractor and would be suitable for the production of aggregates that met the contract requirements. Per the Contract, McCrossan must accept the risk for assuming that the excess excavation would meet the aggregate base specifications. Subsection 204.02 (e), Embankment Material, of the FP-96 defines waste as

> "Excess and unsuitable roadway excavation and subexcavation that cannot be used."

Furthermore, Subsection 204.14 Disposal of Unsuitable or Excess Material states:

> "Dispose of unsuitable or excess material legally off the project."

McCrossan states that in pricing this aspect of the claim, they treated the Excavation at the quarry and the additional waste as an extension of the respective contract line items. McCrossan is requesting payment of $477, 945.75 for this aspect of the work (30,935 @ $15.45). In addition, the 30,935 M3 of Roadway Excavation material that would have been used to produce acceptable aggregate, now becomes excess material. McCrossan requests that it be paid for these quantities at the Contract Bid price of $2.45 per cubic meter for a total of $75,790.75. The total value of this claim is $553,736.50

The quarry was not identified by the Government as a potential materials source – locating a source for materials not represented in the contract as coming from roadway excavation is the responsibility of McCrossan, as noted above. Subsection 301.10 of the FP-96 states:

> "Payment for aggregates will be at the contract price per unit and that payment will be full compensation for the work prescribed in this (301) section.

Also referenced is Subsection 109.05, Scope of Payment which states:

> "Direct payment is when payment is provided directly under a pay item shown in the bid schedule.

Subsection 109.05 also states:

> "Compensation provided by the pay items included in the contract bid schedule is full payment for performing all contract work in a complete and acceptable manner. All risk, loss, damage, or expense arising out of the nature or prosecution of the work is included in the compensation provided by the contract pay item."

McCrossan is responsible for all the risk, loss, damage, or expense associated with providing the required materials and is compensated for said risk, loss, damage, or expense in the contract pay item. McCrossan must accept the risk for assuming that all aggregates and MSE Wall backfill material could be processed from roadway excavation, which the contract did not represent. McCrossan has not substantiated that there was not an adequate quantity and quality of material in the planned roadway excavation to produce the materials represented in the contract as coming from roadway excavation. McCrossan has not proved that there was a changed condition, and therefore the use of the quarry does not provide mitigation of costs. Furthermore, SA No. 1 clearly states that any waste resulting from use of the quarry is McCrossan's responsibility and will be disposed of off the project at no additional cost to the government. This claim is denied.

**Earthwork Overrun**

During construction, McCrossan claims to have experienced an overrun in Roadway Excavation. McCrossan states they have not been compensated for the actual work performed and that additional costs have been incurred in their attempt to secure payment. They also claim that the earthwork overrun resulted in additional time to complete the project and impacted their planned method and sequence of construction. The Claim also states neither McCrossan nor the Engineer was in a position to determine the actual excavation quantities until completion.

Upon completion of the work, McCrossan retained AMEC Infrastructure (AMEC) to survey the actual amount of excavation that had been performed. After they had begun their work and generated some quantities, AMEC personnel met with the FHWA to explain their methodology. The FHWA had concerns about the quantities being generated, and therefore hired RS Engineering (RS) to check AMEC's work. McCrossan states that AMEC and RS agreed on a cross section measurement of 186,000 M3 for the areas that were actually surveyed and cross-sectioned. McCrossan also states that an additional 38,287 M3 of excavation must be added to the cross section total developed by the two consultants, for excavation performed in the approach-roads, the foundation fills at repair sites #1 and #2, and the 0.5' subcut. McCrossan claims that these areas were not included in the 186,000 M3 and should be paid as additional roadway excavation per the FP-96. Adding these additional quantities to the cross-section quantity developed by the two consultants yields a total roadway excavation quantity of 224,887 M3, however, this quantity was reduced by 10,000 m3 to 214, 887 m3 due to McCrossan claiming they had performed 300 mm of subcut in the rock areas of the subgrade when the contract requires only 150 mm of subcut. To date, 172,484 M3 of roadway excavation has been paid for a total payment of $2,664,887.80. Total payment for the claimed quantity of 24,887 M3 would be $3,320,004.15. The amount claimed is the difference between the claimed quantity and quantity paid to date which is 42,403 M3 at $15.45/M3, or $655,126.35.

- McCrossan states that an agreement was made with the Government to pay for additional work performed at the approach roads by paying for an additional 3,363 M3 of roadway excavation. This was not extra work. This is the quantity from the grading summary and had to be included with the as-built quantity since as-built quantity was only done on mainline. FHWA and McCrossan agreed on grading summary quantity for approach roads.
  The Government agrees to pay this quantity as full compensation for work performed at the approach roads

- McCrossan claims that an additional 14,924 M3 of roadway excavation is due them for foundation back fill at repair sites #1 and #2. McCrossan has also claimed payment for this quantity as foundation fill in the foundation fill portion of the claim. Per Subsection 109.05(b) of the FP-96, " Work measured and paid for under one pay item will not be paid for under any other pay item". Also, while Subsection 205.05, Use of Material Found in the Work, of the FP-96 states that material, such as stone, gravel, or sand, found in the excavation may be used for another pay item in the bid schedule; it also states to replace material so used and needed for embankment or backfill with acceptable material at no cost to the Government. Therefore, the Government agreed to pay Roadway Excavation for these repair areas in concept.
  However, a re-calculation of the quantities for this work revealed a corrected quantity of 9,352 m3. As full compensation for the backfill at repair sites #1 and #2, this revised quantity was added to the Roadway Excavation quantity.

- McCrossan claims that 150 mm of subcut was performed in rock cut areas totaling 10,000 M3. There is no indication of this work being performed in the project records or in any confirmable records provided by McCrossan.

The total quantity the Government agrees to pay for roadway excavation is as follows:

| | | |
|---|---|---|
| • | 163,766 | as-built excavation quantities including all extra work except for repair sites, overbreak does not exceed 10% in any location |
| • | 9,352 | repair sites #1 and #2 |
| • | 3,363 | additional excavation for extra work performed at approach roads |
| TOTAL: | 176, 481 M3 | |

This results in an additional payment of 3,997 [176,481 – 172,484 (quantity paid to date)] at $15.45/M3 for $61,753.65 .

In addition to these quantities, McCrossan also claims they are owed approximately $71,179.00 for waste related activities. They state that the roadway excavation overrun led to a proportionate increase in the quantity of waste of which a great deal was hauled off of the project to an area known as the "Horseshoe". Once the material was hauled to that area McCrossan was required to place the material in a manner that was acceptable to the Forest Service, which required crushing a portion of the material down to a size that made it suitable for plating the disposal site. McCrossan claims that the extra work required to crush the additional waste material would not have been necessary if not for the changed conditions, a 35% increase in the estimated quantities associated with the earthwork balance, and a misrepresentation in the bid documents concerning the suitability of the Roadway Excavation for the production of aggregates.

To place a value on this portion of the claim, McCrossan broke it down into two parts, (1) crushing the material and (2) hauling and grading of the approximate quantity of the waste taken to the Horseshoe site. Because they do not have specific cost data tracking all aspects of these impacts, McCrossan estimated actual impacts by assuming 15 working days of activity with 1 crew member and an equipment complement of 1 track mounted jaw crusher and 1 six-cubic yard loader that they claim was actually used to perform this work. McCrossan states that the 15 days is based upon an estimate of the actual time that was required to complete this work.

| | |
|---|---|
| Crushing: Estimated Cost ~ | $22,179.00 |
| Hauling & Placing ~ 20,000 m3 Waste @ $2.45 = | $49,000.00 |

McCrossan also claims that the waste quantities increased proportionally to the excavation and that they should be compensated for the increase. The FHWA believes that the waste increased primarily because of McCrossan's reliance on the quarry for select granular backfill and subbase production rather than material available from onsite and because of poor control over their blasting operations ultimately causing the increased overbreakage. As stated above, McCrossan is responsible for the consequences

of their decision to use the quarry as the material source and to waste material from the roadway excavation that could have been used.

In addition, the LA Abrasion requirement of 50 maximum on the wall backfill as well as the sub-base material was waived by the FHWA in a letter to McCrossan dated March, 22, 2001, to reduce McCrossan's reliance on the quarry and, therefore, also should have reduced the amount of waste generated. Finally, per the terms of SA No. 1, McCrossan was granted permission to use the quarry as an aggregate source and was also required to dispose of excess prism material resulting from using the quarry offsite at no additional cost to the government.

McCrossan's blasting operation also produced a large overrun of waste that is their responsibility. McCrossan did not control their blasting operations as required by the Contract so that the amount of overbreakage would not exceed contract requirements. Subsection 204.16 (2) (b) of the contract states:

> "Overbreakage from the trimline or backslope in rock excavations that exceeds 10 percent of the excavation quantity shown in the approved blast plan will not be included in roadway excavation."

Also, Sheet 7 of the Plans lists the estimated quantity of Roadway Excavation as 158,000 m3 and states that that this quantity "includes additional for overbreak."

McCrossan asked what the allowance for overbreak was in the initial partnering meeting held on January 26 & 27, 2000. The FHWA confirmed that the overbreak allowance was 10 percent. Project records indicate that a majority of the blast holes were drilled weeks in advance of the blasting operations which limited the ability of McCrossan to tailor the blasting plans to account for variations in the geology of the rock slopes and desired aesthetic objectives as required by the contract. In their claim, McCrossan states that neither they nor the Engineer were in a position to determine the actual excavation quantities until completion. This is only because McCrossan did not track the quantities as required by Subsection 205.04 of the contract which lists the requirements for each cut or portion thereof and also requires that after mucking operations have been performed for each blast, the excavated slopes should be measured to determine overbreak quantities. These quantities should have been incorporated as a part of the final blasting report. This portion of the Claim is denied.

The FHWA agrees to pay an additional 3,997 M3 of roadway excavation at $15.45/M3 for $61,753.65, as calculated above, as full compensation for the earthwork overrun claim.

**Foundation fill**

As bid, the project included reconstruction of two sections known as repair areas #1 & #2. The reconstruction areas were between stations 15+300 and 18+290. This was

identified as the "lower section" since it was at a lower elevation than the other sites. The section known as the "upper section" was located from 25+660 to 33+500. Repair section #1 was located within the lower section at station 16+000 and repair area #2 was located within the lower section from station 20+660 to 20+960.

McCrossan states that both of the repair areas had been previously flooded, the roadways had been washed out, and that the emergency repair consisted of a loosely dumped fill of large rocks and earthen material and temporary pavement to facilitate traffic. The repair of these areas was to be accomplished by using MSE walls to contain the roadway embankment rather than earthen fill slopes. McCrossan also believes that the previously constructed emergency fill was considered to be an unacceptable foundation for the MSE wall and was to be removed and re-compacted per the plans.

McCrossan states that although the Plans tabled and quantified work to be paid for as Foundation Fill, Repair Areas #1 & #2 were not included in this table and should have been. This ignores the language of the SCR's (page I-67, Subsection 208.04), which states: "Location of Foundation Fill shown on the plans are for contingency. Actual locations and quantities will be determined by the CO". It also ignores the fact that the Foundation Fill detailed in the plans does not represent the nature of the work performed at repair areas #1 and #2.

McCrossan states that the FHWA has taken several different positions on this issue. Before starting the first Foundation Fill, it was their understanding that the FHWA was going to monitor and measure this particular area as Foundation Fill. After completion of repair area #2, McCrossan claims to have been told that the FHWA considered this to be incidental work. McCrossan protested and asked to escalate this decision. As a result of this escalation, agreement was reached on the quantities, but the FHWA paid for the work as Roadway Excavation instead of Foundation Fill. McCrossan states they agreed to this as a partial payment but reserved their rights to pursue this issue as a claim.

The FHWA retained Kumar and Associates as the Geotechnical Engineer to advise on the construction of the foundation for Repair Areas #1 & #2. McCrossan believes that Kumar's memorandum dated December 20, 2000, confirms that this was a Foundation Fill. They state that this memo shows that the recommended fill was done strictly to provide an acceptable foundation for the walls.

The FHWA has paid for 14,924 M3 at the unit price for Roadway Excavation of $15.45, for a total of $230,560.35. McCrossan contends that this work was a Foundation Fill, not Roadway Excavation. The unit price for Foundation Fill is $24.29, which would generate a payment of $362,479.67. The amount of this claim is the difference between the two sums, or $131,919.32.

By letter dated July 20, 2001, the FHWA has previously advised the Contractor that there is insufficient support for using the Foundation Fill item to pay for work in connection with the two referenced repair sites. Plan Sheet 87 clearly indicates that this work is considered to be embankment and provides the plan details for this work in connection

with embankment benching. Furthermore, the Foundation Fill details (found on Plan Sheets 93 and 94) describe a limited depth of material possessing high bearing strength (foundation fill) immediately under the base of selected retaining walls, to be used at the CO's discretion if and when unsuitable material of low bearing strength was found at the elevation of individual retaining wall foundations. The intended use of this item is not to build embankment but to provide a cushion immediately under an affected structure. The geometry and quantities described on Plan Sheets 93 and 94 support this interpretation.

The FHWA can accept McCrossan's position that the quantities of required excavation were not included in any of the quantity tables in the Plans. From the cross-section provided on Plan Sheet 87, it is clear that the designer anticipated limited excavation at these sites and intended to include any required excavation under benching, which is not a pay item, but incidental work.

The FHWA also agrees with McCrossan's position that the work differed (by the amount of excavation performed) from the details on Plan Sheet 87, and agrees further that this difference needs to be equitably compensated for. However, McCrossan has not provided a single basis on which to determine adequate compensation. McCrossan was requested to determine which manner of payment they would prefer, either a reconstructed cost for each site, based on actual costs, or the existing contract item and unit price for excavation should be applied. Since McCrossan refused to accept either one of these cost analyses, the FHWA elected to compensate them by paying for 14,923 m3 of material at the unit price for Roadway Excavation. It should be noted that a re-calculation of the quantities for this work revealed a corrected quantity of 9,352 m3 and that the Roadway Excavation item was changed to reflect this revised quantity. In summary, this work does not fall under the definition of Foundation Fill and will not be paid as such. This claim is denied.

**Curb Backfill**

McCrossan states that the bituminous taper behind the guardrail was deleted by the FHWA's Project Engineer. Because the guardrail had to be placed as soon as the subgrade was built and before any pavement was placed, they state that it was impractical to pave a taper behind the posts and rail at a later date. The FHWA's solution was to pave up to the front of the guardrail posts and eliminate the bituminous taper. At a later date the guardrail and the curb would be backfilled, which would eliminate the need for the taper. By the time McCrossan completed the backfill around the guardrail and the curb, the FHWA had assigned a new Project Engineer to the project. McCrossan states that payment for this work was denied because the curb backfill was placed in lieu of the bituminous taper detailed in the plans. They also state that this direction was provided prior to the new Project Engineer arriving on the project. The claim states that the plans and specification clearly state that curb backfill will be paid for by the cubic meter and that McCrossan is owed payment for approximately 1700 m3 of backfill at $20.13 for $34,221.00.

McCrossan requested that the bituminous taper behind the guardrail be deleted, because the guardrail had to be placed as soon as the subgrade was built and before any pavement was placed, it was impractical to pave a taper behind the posts and rail at a later date. FHWA agreed with this proposal and allowed for the elimination of the bituminous taper. After McCrossan completed the installation of the guardrail, asphalt and the 125 mm curb, they did not backfill behind the curb nor did they "shoulder" up the vertical edge of pavement that was left after paving up to the face of the guardrail posts. FHWA had assigned a new Project Engineer at the time the paving and guardrail work was being completed. The new Project Engineer requested that the curb be backfilled and the pavement edge be shouldered. McCrossan requested payment for this work. The Project Engineer agreed to pay for curb backfill but did not agree on payment for "shouldering" the pavement edge, stating that the "shouldering" should be incidental to the embankment. 445.87 M3 has been paid for curb backfill behind the 125mm curb. The only remaining portion not paid is for "shouldering".

The total guardrail length is 9,302 M of which 4,167 M has 125 mm curb, which was backfilled and paid for. This leaves a remainder of 5,135 M of shouldering. The quantity for shouldering is calculated to be 75.6 m3 [1/2(.0095 M x .310 M x 5,135 M)]. The Government agrees to pay an additional 75.6 M3 of curb backfill at $21.03/M3 for $1,589.86 as full compensation for shouldering the pavement edge.

**Topping Material**

McCrossan states that on projects involving rock excavation, plating of the top portion of the subgrade with finer material in order to facilitate finishing of topping material is desirable. In section 204.04 of the SCR's, three different paragraphs address the use of some sort of topping material. The first paragraph states that the asphalt pavement and base course will be saved to use as topping in rock cut areas. Paragraph 5 states that the contractor will conserve material meeting the specification for select topping material from roadway excavation to use for roadway topping. Paragraph 7 also states that the contractor will furnish and place aggregate base course as directed by the CO in rough and rocky subgrade areas.

McCrossan milled the existing roadway and used it and the base course to carry traffic and plate rocky cuts. They state that any material that was suitable to use as topping material was conserved. McCrossan also states that the Project Engineer directed them to use aggregate base to plate the roadway to facilitate traffic, yet they still ran short of topping material.

McCrossan produced subbase, MSE wall backfill and aggregate base for use on the project. These materials were produced by crushing and screening and produced both prescreening and crusher fines. McCrossan states that, when they ran out of material to plate the rock cut, they were forced to use these processed products as topping material. Approximately 5,000 m3 of this material was used to prepare rock cut locations. McCrossan is requesting 5,000 M3 at $6.00 per M3, or $30,000.00 for topping material.

There is no pay item for topping material, thus making it subsidiary to roadway excavation. Subsection 204.17 of the FP-96 states that measurement for select topping shall be made by metric ton or m3 at the contract unit price <u>if</u> they are shown in the bid schedule. Subsection 109.05(b) Indirect Payment states that work for which direct payment is not provided is a subsidiary obligation of the Contractor and that payment for such work is indirectly included under other pay items shown on the bid schedule. This claim is denied.

**Horizontal Drilling**

McCrossan has requested additional compensation due to the quantity overrun for horizontal drilling pursuant to the Changes and Variations in Quantities clause of the contract.

McCrossan claims they were forced to utilize horizontal drilling at many of those areas where vertically drilled holes were otherwise shown in the plans. The contract included line items for payment of each method of drilling by the linear meter. The Contract unit prices for those line items were $11.94 for vertical and $14.37 for horizontal blast holes. The Claim states that the FHWA's measurement and payment of the horizontal blast holes at the higher unit price confirms its concurrence with the method used for each blast.

The solicitation contained information outlining the cut areas and quantities, the spacing for the drill/blast holes, and, for estimating purposes, designated whether those drill/blast holes were assumed to be horizontal or vertical. This information was used to calculate the original quantities for bid item 20502 Controlled Blast Hole (vertical) and 20503 Controlled Blast Hole (horizontal). The FHWA believes that drilling and blasting objectives were attainable as represented in the solicitation, and that McCrossan did not heed the warnings of the contract solicitation. This guidance warned of the difficult terrain and differing geology associated with the rock cuts, as emphasized by the following passages from the special contract requirements:

- Subsection 205.01, paragraph 1, states that the General Hitchcock Highway project will require carefully planned and uniquely adapted blasting approaches, to achieve engineered road cuts that are both structurally sound and aesthetically pleasing.

- Subsection 205.04, paragraph 1, states that not less than 2 weeks prior to commencing drilling and blasting operations, submit the following information to the CO for review: …General methods and approach to blasting which account for the full range of geologic settings and physical conditions present on the project. Describe how the specific blasting plans will account for various cut geometries, rock types, access problems, categories of fracturing and faulting, and required face contours.

- Subsection 205.04, paragraph 2, states that after the general blasting information is reviewed and approved, and not less than 3 days prior to the drilling of each cut or portion thereof, or at any time the Contractor proposes to change the drilling and blasting methods, submit a 'Blasting Plan' to the CO for review. The CO will review and approve the blasting plan before any drilling or blasting work commences.

- Subsection 205.04, paragraph 2, states that it is not anticipated that any single blasting technique, or combination of techniques, once proven successful, will be acceptable throughout the project due to a variety of geologic conditions and desired objectives which are present.

- Subsection 205.04, paragraph 3, states that the Contractor is advised that assessment of the areas to be blasted, preparation and review of blasting plans, and subsequent drilling and blasting operations may progress slowly due to the complexity of the work, the possibility of the need for revisions and resubmittals, and the unstable rock formations near and within some blasting areas.

- Subsection 205.07, paragraph 1, states that pioneering the tops of cuts and preparing a working platform to begin the controlled blasting drilling operations may require unusual working methods and use of equipment. Several rock cut areas may not be accessible for standard use of track drill equipment and will require either hand drilling or the use of specialized drill equipment, or the use of horizontal drill holes.

In addition to the above-listed cautions to any prospective contractor, McCrossan attended a pre-bid site visit where construction-related issues and concerns, including those pertaining to the drilling and blasting operations, should have been raised at that time, or at least prior to submitting a bid for the work. It has been documented that McCrossan drilled a majority of the blast holes weeks in advance of the blasting operations, thus limiting their ability to alter the blasting plans to account for variations in the geology of the rock slopes and desired aesthetic objectives as they were identified. In addition, they did not consistently submit cut-specific blast reports as required by the Contract. These facts indicate that McCrossan did not follow the Contract requirements with respect to the drilling and blasting procedures, which required the Contactor to continuously adapt their blast plans to accommodate differing geology and design objectives, and to maximize their expanding experience base to optimize their performance as the job progressed.

McCrossan contends that there are critical differences between vertical and horizontal blast holes; which were exacerbated by unknown geological conditions discovered after the various blasts. They state that in general, vertical drilling leaves a truer face, which greatly reduced the post-blast scaling that was required by the contract, and horizontal blasting leaves large overhangs and many loose boulders in the face. McCrossan also states that these overhangs and boulders had to be scaled with track hoes and breakers to

ensure a safe slope surface and that many of the large boulders had to be later broken by track hoes and breakers to be placed in fills.

McCrossan states blasts using vertical holes and charge time delays tend to cause the excavated material to rise and then settle on the shoulder of the roadway. They also state that horizontal shots cause the material to move laterally across the road and down the adjacent slope and cause a greater amount of fly-rock. In an effort to reduce fly-rock and facilitate the removal of the excavated material, horizontal shots are normally loaded with a lighter powder factor, which again leads to larger size material that has to be broken later to meet fill requirements. In general, McCrossan believes that horizontal blast holes require more labor and equipment and generates less volume of material in a given time as compared to vertical holes. Essentially, with the same, and sometimes greater equipment requirements, for a particular area, the daily excavation production goes down with the use of horizontal blast holes and the costs increase. McCrossan stated that their net result was an increased unit cost of excavation.

Although horizontal drilling is typically more convenient for the contractor since it eliminates the need to pioneer to the top of the cut to establish a bench for vertical drilling, it is the FHWA's opinion that optimizing the use of vertical drilling as suggested in the contract was never fully explored by McCrossan. McCrossan has not demonstrated that the composition, integrity, and joint orientations of the rock cuts on this project varied substantially and beyond the realm of reason from the rock cuts on the previous 5 phases of the General Hitchcock Highway project and from the findings of the preliminary geotechnical reports. They have also not shown that the feasibility of using vertical versus horizontal holes was assessed on a cut-by-cut basis and that these issues were addressed in each cut-specific blast plan, which was then approved in writing by the blast consultant. McCrossan also has not proven that vertical drill holes could not have been used consistently throughout the course of the work and not just during the initial stages of the drilling operation.

McCrossan states that horizontal drilling increased traffic congestion in certain circumstances and also increased survey costs. The horizontal holes had to be surveyed as to location and depth of hole to try to prevent overbreak. However, McCrossan chose to use the following rigs during the drilling phase of the project: 1 Ingersoll Rand (IR) ECM-70, 1 IR 350 and 1 IR 370. Alternative equipment types and procedures such as a crane-mounted drill and hand drilling, when used effectively, are less likely to impede construction traffic. For rock cuts with limited access to the crown, it is also possible to lift equipment into position via a crane. It was not shown that McCrossan ever considered these or other options.

McCrossan states that the additional costs were felt predominantly in production of roadway excavation and that using a measured mile was the most appropriate way to examine these impacts. To determine the impacts upon the Roadway Excavation unit costs, McCrossan determined that there was a time frame where the ratio of vertical to horizontal drilling was reasonably consistent with the quantities indicated by the Government in the Contract Documents. They state that this time frame was from April

1, 2000 to September 1, 2000 and used this as a representative baseline for their calculation. McCrossan states that during this time there were 89 roadway production shots, and the Government measured and paid for 44,678 cubic meters of excavation. This would equate to approximately 500 cubic meters per shot. They also state that the FHWA measured and paid for 5763 meters of vertical blast holes and 2742 meters of horizontal blast holes during this time span. This ratio of vertical to horizontal is almost identical to the bid quantities and the assumptions the FHWA made in calculating these estimated quantities. During this base period, McCrossan states their actual roadway excavation costs was $9.79 per cubic meter.

McCrossan then performed the same calculations for the time period from September 2, 2000 to March 1, 2002. They state that during this time frame there were 277 roadway production shots and that the blasting related excavation quantity was approximately 104,8000 cubic meters. This equates to approximately 380 cubic meters per shot. McCrossan notes that the FHWA paid for approximately 128,000 cubic meters of roadway excavation during this time frame but 22,900 cubic meters were not related to blasting (the two repair sites and the slope slide at Sycamore Canyon). For the blast quantities, McCrosssan states that the FHWA measured and paid for 2,766 meters of vertical blast holes and 40,015 meters for horizontal. Based on the ratio of vertical to horizontal blast holes in the bid schedule the anticipated quantity of horizontal holes should have been approximately 9,250 meters and the anticipated quantity of vertical holes should have been 18,500 meters. Focusing solely on this particular time period, they state that the increase was 430% and that their actual production costs for this time period was $21.55 per cubic meter of excavation.

McCrossan states that the FHWA's measurement and payment of the horizontal blast holes at the higher unit price confirms its concurrence with the method used for each blast. Per Subsection 103.01 of the FP-96, Intent of Contract, the intent of the contract is to provide for the construction and completion of the work described and that the precise details of performing the work are not stipulated, except as considered essential for the successful completion of the work. McCrossan also states that the actual costs to perform roadway excavation during a portion of the project when the ratio of vertical to horizontal drilling was almost identical to the bid quantities and the assumptions the FHWA made in calculating these anticipated quantities was $9.79 per cubic meter. For the portion of the project when the ratio of vertical to horizontal drilling was significantly lower, their roadway excavation costs were $21.55 per cubic meter. The solicitation contained very specific information outlining the cut areas and quantities, the spacing for the drill/blast holes, and designated whether those bore holes were to be horizontal or vertical. Those designations were used to calculate the original quantities for bid item 20502 Controlled Blast Hole (vertical) and 20503 Controlled Blast Hole (horizontal) of 28,000 M and 14,000 M, respectively. The means and methods McCrossan chose proved to be not only less productive, but cost more than twice what they experienced in the "measured mile". There is no basis provided for this decrease in productivity and increase in costs that indicates responsibility on the part of the Government.

The difference between the unit cost of blasting related excavation performed for that portion of the project where the ratio of the two drilling methods was consistent with the quantities in the Contract versus that portion where there was a large overrun in horizontal drilling is $11.76 per cubic meter. In an attempt to create an "apples to apples" comparison of these two time frames, McCrossan reduced the cost of the roadway excavation by $353,805 to take into consideration the non-blasting related roadway excavation. The sum of $353,805 was arrived at by multiplying the 22,900 cubic meters of non-blasting related excavation by the bid unit price of $15.45. They also reduced the roadway excavation cost by the amount of the "quarry claim" ($545,950.00) and the amount of "waste and crushing claim" at the Horseshoe ($82,000.00). McCrossan states that the Variation in Quantities clause allows for a 15% overrun or underrun without a price adjustment. Therefore the quantity 104,800 cubic meters of affected excavation would be reduced to 89,150 cubic meters. This is mere tweaking of the numbers without a logical basis.

McCrossan believes that the increased production costs of the roadway excavation due to the 28,125 meters increase in horizontal drill holes reflects a defect in the original bid documents and thus a constructive change, a latent physical condition at the project site under the differing site conditions clause, and, at a minimum, a material and compensable increase in the estimated quantities and the related impacts to those costs. Based on the analysis of unit costs for excavation discussed above, McCrossan requests an adjustment in the amount of $1,281,250.22 .

With respect to slope scaling, there is no pay item for slope scaling thus making it subsidiary to roadway excavation. Subsection 204.17 of the FP-96 states that measurement for slope scaling shall be made by the cubic meter at the contract unit price <u>if</u> they are shown in the bid schedule. There was no such item in the bid schedule for this Contract. Subsection 109.05(b) Indirect Payment states that work for which direct payment is not provided is a subsidiary obligation of the Contractor and that payment for such work is indirectly included under other pay items shown on the bid schedule.

In addition, McCrossan infers that a differing site condition was encountered when they stated that unknown geological conditions were discovered after the various blasts. However, they failed to give notice of such conditions to the Government. Per Federal Acquisition Regulation (FAR) Clause 52.236-2, Differing Site Conditions:

> "The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of subsurface or latent physical conditions at the site which differ materially from those indicated in the contract; or unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract."

Furthermore, Clause 52.236-2 states:

"No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required…"

This clause also permits the contracting officer to extend the timeframe for providing written notice of subsurface, latent or unknown physical conditions. Since McCrossan did not file a written notice, the government had no chance to mitigate any alleged damages, therefore any claim at this time of "differing site conditions" will not be considered.

This claim is denied.

**Liquidated Damages**

McCrossan states that $475,000 has been withheld as liquidated damages and that they are entitled to additional contract time that would more than offset these liquidated damages.

McCrossan believes there were several issues that arose or were ascertained subsequent to execution of SA No. 2 that entitle them to additional performance time and compensation. These issues include impacts due to an overrun in the earthwork and consequently the full impacts of the unsuitability of the roadway excavation for use as aggregates, and the final overrun of horizontal drilling and their impact upon the project. They also state that weather impacted several aspects of the asphalt placement and construction of various concrete structures and that their time calculations in SA No. 2 assumed that the weather would not impact their operations; and that it was agreed that they would be given additional contract time to account for weather related delays.

SA No. 2 was necessitated in part due to the slow progress being made on the project. Project records indicate that the first mention about McCrossan being behind schedule was at the July 12, 2000, partnering meeting. Also discussed at this meeting was holding out retent for anticipated liquidated damages, although this did not occur. Holding out retent was discussed again at the July 18, 2000, partnering meeting; with the decision made to wait a few months. By October 19, 2000, McCrossan had used 35% of the contract time, but had completed only 12% of the work. At this point, the FHWA believed that the job would likely run one year past the original completion date. McCrossan felt that the quarry rock being used for wall backfill had cost them time and could be a differing site condition. However, they felt they had enough equipment on site and had good momentum. The FHWA held an internal meeting on November 10, 2000, in which they decided to assess liquidated damages beginning in February 2001. Concerns about McCrossan's progress were raised again in the November 27, 2000, partnering meeting. It was stated during this meeting that liquidated damages may be withheld beginning in February 2001. An interim partnering meeting was held on February 14, 2001. The minutes for that meeting state that the project was seriously behind schedule, with McCrossan facing liquidated damages. McCrossan felt they had

sufficient reasons to be granted a schedule time extension based on several factors. They agreed to submit this list for consideration by the FHWA.

McCrossan requested that 110 calendar days be added to the project in a letter to the FHWA dated February 23, 2001. They stated that the time increase was due to three main issues: 1) excavation material did not meet project specifications, 2) delays prevented the construction of MSE wall at repair area #1, and 3) an overrun in horizontal blast holes. In a fax to the Government on June 11, 2001, McCrossan raised some discussion points. The discussion points included whether or not interim milestones would be established, or whether the parties would agree to revise the final completion date. McCrossan stated that they sensed that this was an opportunity to clean up all outstanding issues. Further discussions and negotiations resulted in SA No. 2.

SA No. 2, dated October 19, 2001, increased contract time by 129 calendar days to January 21, 2002, and compensated McCrossan for costs associated with the time increase. The additional time granted and cost adjustments were full consideration for all time-impacts that were experienced to date, including the work restrictions due to the presence of the Mexican Spotted Owl during the summer months of 2001, time to gain access to a materials source, and for time impacts associated with overruns in horizontal drilling. The additional costs were for unrecovered contractor overhead, sand for winter maintenance, mobilization, and special overhaul. This SA also stated that the revised completion date would be considered the substantial completion date and that weather, except unusually severe weather, and restrictions due to the presence of the American Peregrine Falcon and Mexican Spotted Owl during 2002, in accordance with Section 108.01 as described below, would not be considered causes for further time considerations. SA No. 2 also states that weather, except unusually severe weather, would not be an excuse for failure to complete all construction other than pavement concrete curb placement, and seeding/landscape.

Section 108.01 of the Special Contract Requirements (SCR's) specifies certain areas and time frames in which construction activities would be limited or restricted should the American Peregrine Falcon or the Mexican Spotted Owl be present. Section 108.01 also states that time will not be extended for stoppage or restriction of work within these areas from February 1 through May 15 for the American Peregrine Falcon and from March 1 through May 31 for the Mexican Spotted Owl. Should construction operations be stopped or restricted from May 16 to August 31 due to the presence of the American Peregrine Falcon or from June 1 to August 31 due to presence of the Mexican Spotted Owl, a time extension may be considered in accordance with Section 108.03, but that no equitable adjustment will be made for costs, delays, or other damages due to the presence of these protected species.

As of February 14, 2002, the Contract was not substantially complete. Substantial completion as defined in section 101 of the FP-96 was debated during the negotiations for SA No. 2 but ultimately was not changed. McCrossan's claim that completion of one lift of pavement by the contract completion date achieved substantial completion is invalid. The Contract defines substantial completion as:

> "The point at which the project is complete such that it can be safely and effectively used by the public, without further delays, disruptions, or other impediments."

It is also the FHWA's determination that items of work such as armor plating of ditches, extending and relocating rundowns, extending guardrail, adding end treatments and other such incidental items were not changes, but the completion of work required by the Contract, and, further, they were not on the critical path.

In addition to the post Modification weather impacts, McCrossan claims to have lost critical time due to extra work performed at the direction of the FHWA, including, but not limited to, modified slope construction to address dangerous conditions caused by unexpected geological conditions. McCrossan claims that a differing site condition encountered at the San Pedro cut resulted in additional excavation, that led to lost efficiency and additional time because the work was performed under difficult conditions due to the limited work area and the need to carry traffic. McCrossan states that all of these impacted operations were subsequent to the execution of SA No. 2, and that they are entitled to no less than 100 additional working days as well as additional compensation.

McCrossan states that the San Pedro cut and the manner in which the changed conditions were handled by the FHWA is the most significant impact to the project subsequent to the signing of SA No. No. 2. They state that the San Pedro cut was the last roadway cut left on the upper project and that they set off several small blasts from September 12, 2001, to October 4, 2001, so that an access road could be built to allow drilling equipment access to the top of the cut. After the road was pioneered, Bob Cummings (Blasting Consultant) came to the site on October 8, 2001 to measure and photograph the site so that a blasting plan could be developed. McCrossan received a memo and blasting plan from Mr. Cummings on October 9. This memo expressed Mr. Cummings' concern that even though the left side of the cut was not intended to be excavated it was unsafe and should be laid back. McCrossan continued with the blasting, excavating, and pioneering through October and early November. On November 20, McCrossan stated during a partnering meeting that the left side of the cut at San Pedro was dangerous and that it should be looked at. The FHWA, McCrossan, USFS, and Mr. Cummings reviewed the site after the meeting. Several methods of bringing the material down without creating a safety problem or traffic blockage were discussed. McCrossan agreed to prepare some data involving a grade change and possibly a minor realignment change to accommodate a bypass of the unsafe area until the material could be removed.

McCrossan states that they received a memo from Mr. Cummings on November 21, 2001, which suggested an excavation method that would enable them to remove the material on the left and keep traffic flowing. On November 28, the FHWA recommended that the blasting consultant review the cut on the right side of the roadway at San Pedro. On November 29, Mr. Cummings was on site to review and make recommendations as how McCrossan should proceed with the right side of the cut, and on December 12,

McCrossan received his recommendation and forwarded it on to the FHWA. On December 20, the FHWA told McCrossan that they could go ahead and bring the rest of the cut down now that most of the loose material was removed. McCrossan had brought the cut approximately half way down by this time.

The claim states that arrangements were made for Mr. Khamis Haramy (FHWA Geotech) to review the site during the week of January 7,2002. Mr. Haramy was also sent photos of the cut along with Mr. Cumming's report for both sides of the cut. On January 7, the FHWA stated that a design for a temporary detour in the San Pedro Cut area was still needed from McCrossan. On January 9, Mr. Haramy and Mr. Cummings met on site to review the cut. McCrossan states that the recommendations were to bring down the material on the left side with a track hoe and not blast as was originally contemplated and on the right side to lay back the slope on a 1:1 starting about mid height with spot bolting and scaling as required throughout. McCrossan received a memo from Mr. Cummings on January 10, 2002 detailing the recommendations he and Mr. Haramy had agreed upon. McCrossan states that the work was completed by the end of January and the subbase, base course and first lift of asphalt were placed by the February 14.

McCrossan states that, given the unexpected geological site conditions discovered at San Pedro, if the FHWA had timely considered and followed Mr. Cummings' suggestion to remove the slide area on the left side of the San Pedro cut, the Project would not have been delayed by over a month. Additionally, McCrossan claims that there was extra work performed and time lost to effectuate the FHWA's directives in this area to lay back the slopes on the left and right sides of the roadway. McCrossan's analysis asserts that, at a minimum, these issues delayed completion by 50 days.

McCrossan has not proven that completion of the San Pedro cut became the controlling item for the project or extended the critical path of the project. Per SA No. 2, McCrossan was required to achieve substantial completion by January 21, 2002. Notes from the Project Engineer's diary on January 07, 2002, indicate that the upper section has the majority of the work yet to be completed. The diary entry also states: "The Rose Canyon, Green Mountain, San Pedro, and Bigelow were a long ways from being completed, they were at best constructed to rough grade". In the Partnering Meeting held on January 22, McCrossan stated they were making a "big push" in the San Pedro Cut and Rose Canyon, and were shooting to have the grade done by the end of the month (January). There were many other areas that McCrossan was working in while a solution for the San Pedro Cut was being determined.

McCrossan states that, in addition to the San Pedro impact, there were several other impacts for which additional time should have been granted. They state that when SA No. 2 was signed, the earthwork summary showed that the upper job should balance or possibly be somewhat short as far as the embankment material needed and excavation material available. They then state that an additional 6,000 m3 of excess material was generated, excluding San Pedro, which had to be dealt with and that this material was wasted by changing grades, flattening slopes and disposing of over 3,000 m3 at the helipad site. McCrossan also believes an unforeseen differing site condition caused

additional delays and additional expense. Please refer to the Quarry and Earthwork Overrun portions of the claim for the FHWA's position concerning waste and to the Horizontal Blast Holes portion of the claim for the FHWA's position on a differing site condition.

McCrossan states that per the plans and specifications, they were to construct a containment berm and a turnout at Sollars Road, which is directly across from the quarry site. The berm and the turnout were constructed as per the plan and specification. McCrossan then states that the FHWA changed the configuration of the berm and the grade and alignment of the turnout, and that these changes delayed the paving through the quarry area. As stated above, there were several areas (Rose Canyon, Green Mountain, San Pedro, and Bigelow) that were far from completion in January 2002. Completing the berm at Sollars road was not a controlling item for this project and McCrossan has not proven that this work impacted the critical path of the project.

McCrossan states that other changes such as armour plating ditches, extending and relocating rundowns, extending guardrail, adding end treatments and other changes also added to the delays. McCrossan believes that although these issues may seem minor, given their strict interpretation of the language of SA No. 2 they become significant. The FHWA's position is that McCrossan has not provided any documentation as to why additional time is required for these minor items nor proven that they impacted the critical path of the project.

In addition to the items that allegedly affected the Contract completion date, as discussed above, McCrossan believes that the FHWA should consider that they were forced to endure an ever-changing administration team for the FHWA at the project level. They believe the changes in personnel assigned to the project made it difficult to maintain continuity of communication. The FHWA's Project Engineer was changed late in 2001, about the time SA No. 2 was executed. McCrossan has not shown how the FHWA's staffing of the job impacted the project. McCrossan fell significantly behind schedule early in the project, necessitating SA No. 2, and they fell significantly behind schedule after SA No. 2 was executed. McCrossan failed to meet the project completion schedule regardless of whom the FHWA assigned as the Project Engineer.

When reviewing the time of completion, the Claim states that the FHWA also should consider the fact that the specific language of SA No. 2 allows for adjustments in contract time if weather affects the productivity of critical items such as paving. McCrossan believes that this was the case, and as such they are entitled to an adjustment of contract time. SA No. 2 states that the revised completion date will be considered the substantial completion date and that weather, except unusually severe weather, and restrictions due to the presence of the American Peregrine Falcon and Mexican Spotted Owl for year 2002, will not be considered causes for further time considerations. McCrossan has not provided data showing that they were impacted by unusually severe weather during this portion of the project.

McCrossan also believes that the FHWA's time calculations fail to account for the fact that McCrossan had placed a minimum of 1 lift of pavement by February 14, and they are alleging that they had obtained substantial completion per their interpretation of the language of the Modification. The Claim also states that despite this, the FHWA started withholding liquidated damages even though the work was stopped on February 14, 2002, due to the owl/falcon restrictions. The Claim states that, given the alleged compensable delays after SA No. 2 referenced above, that it is not only improper to assess liquidated damages for falcon restrictions during the 2002, but that the shut down is itself compensable.

> However, the Contract requirements for Substantial Completion were not changed by SA No. 2. Substantial Completion is defined in the FP-96 as "the point at which the project is complete that it can be safely and effectively used by the public without further delays, disruption, or other impediments. For conventional bridge and highway work, the point at which all bridge deck, parapet, pavement structure, shoulder, drainage, sidewalk, permanent signing and markings, traffic barrier, safety appurtenance, utility, and lighting work is complete."

In addition, although McCrossan infers in the claim that 1 lift of pavement met the requirements for Substantial Completion, they stated in a letter to the FHWA dated June 19, 2001 that: "Per our discussions, we understand substantial completion to be defined as both lifts of asphalt surfacing and installation of all guardrail." Substantial Completion was not achieved by February 14 under either definition.

It is McCrossan's position that the FHWA's directive to suspend operations in February, 2002, amounts to a change, an act of interference with the operations, and a breach of the FHWA's duty to cooperate. As of that time, it was McCrossan's understanding that the subject birds were not even protected species. Accordingly, the Claim states that the FHWA had an affirmative obligation to take the steps necessary to allow McCrossan to continue working on the project, and that its failure to do so renders the directive to suspend operations compensable. However, Section 108.01 of the Special Contract Requirements (SCR's) is very clear with respect to specifying certain areas and time frames in which construction activities would be limited or restricted should the American Peregrine Falcon or the Mexican Spotted Owl be present. Section 108.01 also states that time will not be extended for stoppage or restriction of work within these areas from February 1 through May 15 for the American Peregrine Falcon and from March 1 through May 31 for the Mexican Spotted Owl. These restrictions were not changed by SA No. 2 and remained in effect throughout the duration of the project.

The owl/falcon restriction lasted from February 14 through May 31, 2002. Forest fires then delayed the project until July. The Claim alleges that once McCrossan started work in July 2002, the FHWA made numerous changes that added additional work. The Claim estimates that this delayed McCrossan's final completion by 50 days. However, as noted above, per Section 108.01 of the SCR's and the terms of SA No. 2, McCrossan is not entitled to additional time for the owl/falcon restriction.

Overall, it is McCrossan's position that they are entitled to an additional 150 working days for the additional work associated with the overruns in Roadway Excavation, Waste and Horizontal Drilling, the post-SA No.2 impacts from inclement weather, the changed conditions at the San Pedro Cut, and the numerous changes and additions to the work performed after they were allowed to return to the project following the forest fires that took place in 2002. McCrossan estimates that their fixed costs related to this Project are $43,601 per month. Based on an entitlement to 150 working days subsequent to the signing of SA No. 2, McCrossan is requesting the remission of all liquidated damages and compensation of $327,010.00 for additional overhead.

During the period between February 15, 2002 and May 15, 2002, construction activities required for substantial completion continued in those areas that were not restricted. SA No. 2 states that restrictions due to the presence of the American Peregrine Falcon and Mexican Spotted Owl for year 2002 will not be considered causes for further time considerations. Therefore, during this time period liquidated damages were assessed in accordance with section 108.04 of the SCR's at a rate of $2,500.00 per day, or $225,000.00.

During the period between May 15, 2002 to August 27, 2002, the FHWA determined that liquidated damages would not be assessed due to the presence of mating pairs of the American Peregrine Falcon and the fire restrictions imposed during this time period.

During the period between August 27, 2002, and November 25, 2002, there were no restrictions, therefore liquidated damages were assessed at a rate of $2,500.00 per day, or $227,500.00, in accordance with Section 108.04 of the SCR's for this period.

The Contract was determined substantially complete as of November 25, 2002 and final completion was finally achieved on April 9, 2003. During the period of time between November 26, 2002, and April 9, 2003, liquidated damages were assessed in accordance with section 108.04 of the FP-96 at 20% of the $2,500.00, or $500.00 per day, or $67,500.00.

There is no basis provided in the claim for additional time due to weather-caused delays. SA No. 2 states that weather, except unusually severe weather, will not be considered cause for further time considerations. McCrossan has not provided any data proving that the weather was unusually severe during this time frame. All items of work other than pavement, concrete curb and seeding/landscape, were not completed prior to the contract completion date. This includes work such as repairing damaged guardrail, correcting drainage problems, and other items.

McCrossan claims that additional time should be granted for the quantity of excavation, unsuitability of roadway excavation for use as roadway aggregates, overrun of horizontal drilling, and excavation at the San Pedro cut. Two of the issues, unsuitability of roadway excavation and overrun of horizontal drilling, were granted additional time in SA No. 2 and no further additional time is due. SA No. 2 included by reference a letter from McCrossan dated February 23, 2001, which requested time for these two issues. The

third issue, work performed at the San Pedro cut, was discussed above and was not proven to affect the critical path, hence no time is allowed.

Also, McCrossan did not provide the information required per Subsection 108.03 of the FP-96 to justify the time they requested. Subsection 108.03, Determination and Extension of Contract Time, in the FP-96; states:

> "When requesting a time extension, follow the applicable contract clauses and make the request in writing and include the following: (a) contract clause(s) under which the request is being made; (b) detailed narrative description of the reasons for the requested contract time adjustment including the following: (1) cause of the impact affecting time, (2) start date of the impact, (3) duration of the impact, (4) Activities affected, and (5) methods to be employed to mitigate the impact."

In addition, Subsection 108.03 (c), states:

> "Suggested new completion date or number of days supported by current and revised construction schedules according to Subsection 155."

All McCrossan has provided are estimates of days they believe they are due.

The FHWA does agree, however, that McCrossan is due additional time for the overrun in Roadway Excavation. The calculation of additional time is as follows: the total quantity of excavation performed was 176,481 cubic meters, which is 18,481 cubic meters greater than the contract quantity of 158,000 cubic meters. A good days excavation on the current Mount Lemmon project is 800 cubic meters. Dividing 800 cubic meters into 18,481 cubic meters yields 23.1 (say 24 days). The resulting release in Liquidated Damages is 24 days time at $2,500 per day, or $60,000.00.

## IV. CONCLUSION

The compensation granted by this decision is summarized as follows:

| | |
|---|---|
| Quarry | $0.00 |
| Roadway Excavation | $61,753.65 |
| Foundation Fill | $0.00 |
| Curb Backfill | $1,589.86 |
| Topping Material | $0.00 |
| Horizontal Blast Holes | $0.00 |
| Liquidated Damages | $60,000.00 |

AMOUNT DUE: = $123,343.51

Pursuant to the foregoing findings and determinations, the amount of the additional allowance is $123,343.51, plus interest computed in accordance with the Contract Disputes Act of 1978. The Roadway Excavation portion of the claim was certified by McCrossan in a letter dated January 21, 2003, and received on January 21, 2003. Interest for the Roadway Excavation portion of the claim ($61,753.65), including return of Liquidated Damages (60,000.00) withheld due to the overrun in Earthwork Excavation, is therefore computed at rates fixed by the Secretary of the Treasury beginning on January 22, 2003. The remaining issues in the claim were summarized and certified in a letter from McCrossan dated April 9, 2003 and received on April 9, 2003. Interest for these remaining issues ($1,589.86) is therefore computed at rates fixed by the Secretary of the Treasury beginning on April 10, 2003. Interest will be computed through the actual payment date.

This is the Contracting Officer's final decision on the matter and is being issued pursuant to FAR 52.233-1, Disputes, of the contract. You may appeal this decision to the Department of Transportation Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board of Contract Appeals addressed as follows:

The Honorable James L. Stern
Chairman, Board of Contract Appeals
Office of the Secretary
Department of Transportation
400 Seventh Street, S.W.
Washington, D.C. 20590

In addition, you must provide a copy of your notice of appeal to the Contracting Officer from whose decision the appeal was taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. As an alternative to the Board of Contract Appeals, you may bring an action directly to the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely yours,

S. Greenwell 11/16/04

Seth Greenwell, P.E.
Contracting Officer

bcc w/enclosure:

V. Philbin, Senior Attorney
J. Perry, Legal Counsel
S. Greenwell, Construction Engineer
S. Schmidt, Contract Development Engineer
B. Welch, Materials Engineer

C. Luedders, Construction Management Engineer
R. Everett, Construction Operations Engineer
J. Klamerus, Construction Operations Engineer
B. Quintana, Project Engineer
C. Holsopple, Assistant Construction Management Engineer
Claim file
Reading file

Cholsopp: L\CONST\CLAIMS\MCCROSSAN\CO'sDecision

**ATTACHMENT 1**

C. S. McCrossan, Inc.

100 South 75th Drive, Tolleson, Arizona 85353
Phone: 623/936-1488 • Fax: 623/936-4481

January 21, 2003

Mr. Randy Everett
Contracting Officer
U. S. Department of Transportation
Federal Highway Administration
Central Federal Lands Highway Division
555 Zang Street # 259
Lakewood, CO 80228

RE: CONTRACT DTFH68-00-C-00010 GENERAL HITCHCOCK HIGHWAY (Mt Lemmon)

Dear Mr. Everett:

At the direction of FHWA, both R.S. Engineering and AMEC Infrastructure were commissioned to measure and quantify the excavation quantities completed by C.S. McCrossan, Inc. on the Mt. Lemmon project. The two firms have completed their work and they have compared each other's methods and conclusions.

It is our understanding that, consistent with the Contract terms and conditions, FHWA will update the Contractor's Monthly Progress Estimate for payment based upon the quantities of excavation agreed upon by R.S. Engineering and AMEC. We have attached a spreadsheet table to this correspondence detailing our understanding of the quanties and calculations that should be used to increase the completed quantity under CLIN 20401, Roadway Excavation, to reflect the final quantities.

As you can see from the table, McCrossan has completed 217,755 cubic meters of Roadway Excavation. The Contract Unit Price for this work is $15.45 per cubic meter. To date, FHWA has paid for 172,484 cubic meters leaving a balance due of 45, 271 cubic meters or $ 699,436.95. This figure is based on the original unit price. McCrossan is analyzing whether an adjustment to the unit price is appropriate under the VEQ clause since the quantities have increased by 26 %. At a minimum, McCrossan is entitled to the original unit price.

In previous correspondence FHWA personnel have suggested that payment should be limited to the adjusted plan quantity plus allowable overbreak. McCrossan disagrees with this position on grounds that the allowable overbreak calculation was inaccurate. FHWA did not properly adjust the original planned quantity of excavation to reflect the data generated by R.S. Engineering and AMEC from measurements taken upon completion of the excavation. Also, McCrossan was not given the means with which to control the overbreak through presplitting. The nature of the roadway and subsurface conditions dictated that the only practical means of drilling the blast holes was horizontally due to the extremely limited access to the work areas. Since the drilling lengths were predetermined by the project design and FHWA approved the blasting plans, we do not understand how the Owner can justify not paying for all work completed under this line item. Additionally, the Owner must take into account the quantity of added excavation performed at the direction of FHWA to repair or stabilize slopes throughout the project. Those quantities cannot be included in the calculation of total excavation for purposes of determining the percentage of overbreak. Accordingly, we are formally requesting that FHWA immediately update the Contractor's Monthly Progress Estimate to reflect the actual quantity of work performed and pay the amounts past due. It should be noted that McCrossan is entitled to interest on this delayed payment.

In addition to the quantity issues, McCrossan does not believe that FHWA can justify the withholding of $390,000 for liquidated damages and demand is hereby made that all such amounts be released with interest. The original contract time was obviously based upon the anticipated plan quantities of excavation.

We have now confirmed that those quantities have increased by 26 %. In light of the fact that the excavation was the most significant of the critical activities and had an enormous impact on the balance of the other critical activities, McCrossan is entitled to additional time and money for the resulting delays. This issue has not been accounted for or included in the Contract Modifications that have been issued to date.

The assessment of liquidated damages also cannot be justified given the delays that McCrossan experienced from the winter of 2001 to the late spring of 2002 due to weather and protected species requirements. These delays obviously were not included within the scope of the Contract Modifications After execution of the relevant Modification, FHWA made significant design changes in the roadway/slope requirements that impacted our progress. At this time, we are in the process of calculating the actual time impacts that resulted from the owner-mandated changes in contract scope and the quantity overruns. Even though that process is not yet complete, we are confident that an objective review of the facts precludes the assessment of liquidated damages.

It is McCrossan's position that FHWA could have and should have been more assertive and proactive in dealing with the protected species restrictions that were not justifiable based on federal law in place during the course of the Contract. FHWA's failure to properly manage this issue caused considerable delays to McCrossan's progress. We believe that these delays are compensable and McCrossan reserves the right to present its claim for home office and project overhead.

We wish to note that this correspondence is not intended to address all issues associated with the Contract, but rather is only intended to correct two obvious payment issues based solely on the Contract Unit Prices. It does not account for any impacts that have occurred as a result of the quantity overruns or the improper withholding of McCrossan's progress payments. Based upon the foregoing, McCrossan hereby demands that the FHWA immediately pay McCrossan $1,089,436.95 plus the appropriate amount of interest.

McCrossan respectfully request that you issue a final decision on this claim. In addition, the undersigned certifies that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which McCrossan believes the government is liable and that I am authorized to certify this claim on behalf of McCrossan.

If you have any questions or comments regarding this matter, please contact my office at 623/936/1486.

Sincerely,

Joseph McCrossan

# ATTACHMENT 2

C. S. McCrossan, Inc.

100 South 76th Drive, Tolleson, Arizona 85353
Phone: 623/936-1466 • Fax: 623/936-4445

April 9, 2003

Mr. Randy Everett
Construction Operations Engineer
Federal Highway Administration
555 Zang Street, Room 259
Lakewood, CO 80228-1010

Subject: Project PFH 39-1(6), General Hitchcock Highway

Dear Mr. Everett:

The following preliminary information is provided in response to your March 13, 2003 letter addressing our claims for the referenced project. The items listed herein represent a summary of the issues establishing the basis for entitlement as asserted by McCrossan. As you requested, this information is provided so that you may begin researching the issues within your own records. Further details are to be presented and discussed more formally at the Settlement Conference scheduled for April 22, 2003 in Phoenix.

1. Earthwork Overrun – During construction, McCrossan experienced a substantial overrun in the quantity of work associated with pay item 20401 Roadway Excavation. McCrossan has not been compensated for the actual work performed in a timely manner and has incurred additional costs in its attempt to secure payment. Performance of the additional work also has required additional time to complete the project. Significant impacts to the planned method and sequence of construction resulted as a direct consequence of these changed conditions. It should be noted that neither McCrossan nor the Engineer was in a position to determine the actual excavation quantities until completion.

Upon completion, the FHWA instructed McCrossan to commission a field survey to determine how much excavation had been done. We then instructed AMEC to do the survey. After they had done some of the work and generated some quantities, AMEC personnel met with the FHWA to explain their methodology. The FHWA had concerns about the quantities so they hired RS Engineering to check AMEC's work. AMEC and RS have now agreed on a cross section measurement of 186,600 M3 for the areas that were actually surveyed and cross-sectioned. However, an additional 38,287 M3 of excavation must be added to the cross section total for excavation areas not previously included. These areas include the cross roads, the foundation fills at the repair sites #1 & #2, and the 1' sub cut in the rock cut areas of the subgrade. Adding these additional quantities to AMEC's cross-section quantities generates a total quantity of 224,887 M3. FP 96 clearly confirms that these excavation areas should be measured and paid as additional roadway

excavation. This would bring the total roadway excavation to approximately 224,887 M3. To date, FHWA has only paid for 172,484 M3 (at $15.45 M3) for a total of $2,664,847. The quantity of 224,887 M3 would generate a payment of $3,474,504.15.

In addition to this amount, FHWA also owes approximately $74,000 for waste related activities. As originally designed by FHWA, the project would have generated a surplus of excavated material. Contract Line Item 20402, "Waste", was established to compensate the Contractor for disposing of the excess material. With the substantial overrun in the volume of excavation, the quantity of waste also increased proportionately. In order to dispose of the increased waste, McCrossan was forced to haul a great deal of the excavation off of the project to the area known as the "Horseshoe". Once the material was placed in that area, FHWA directed that it be placed in a manner that was acceptable to the Forest Service. This required crushing a portion of the material down to a size that made it suitable for plating the disposal site. This extra work was not contemplated by the original specifications or unit price for Waste. In order to place a value on this portion of the claim we have broken it down into two parts, crushing of the material and hauling and grading of the approximate quantity of Waste taken to the Horseshoe site. The crushing costs were tracked by McCrossan's accounting system.

| | |
|---|---|
| Crushing: | $ 25,000.00 |
| Hauling & Placing ~ 20, 000 m3 at Waste Price $2.45 | $ 49,000.00 |

Therefore, McCrossan is entitled to an additional payment of $883,657.25 due for the Roadway Excavation item.

2. Foundation Fill-As bid, the project included two sections to reconstruct and two sections that were known as repair areas #1 & #2. The reconstruction areas were from stations 15+300 to 18+290. This was identified as the "lower section" since it was at a lower elevation than the other reconstruction section. The section known as the "upper section" was located from station 25+660 to 33+500. Repair section #1 was located within the lower section at station 16+000. Repair area #2 was located between the lower section and the upper section at station 20+660 to station 20+960. Both of the repair areas had been previously flooded and the roadways had been washed out. The emergency repair consisted of loosely dumped fill of large rocks and earthen material and temporary pavement to facilitate traffic. The reconstruction of these repair areas was to be accomplished by using MSE walls to contain the roadway embankment rather than earthen fill slopes. The previously constructed emergency fill was considered to be an unacceptable foundation for the MSE wall and was to be removed and recompacted per the plans.

FHWA's plans tabled and quantified some of the potential foundation fill areas. Repair areas #1 & #2 were not included on this table. The FHWA has cited this omission as somehow supporting its position that this work was not a foundation fill. But this position ignores the language of the SCR's (page I-67, section 208.04), which states: "Location of foundation fill shown on the plans are for contingency. Actual locations and quantities will be determined by the CO."

It is well documented in partnering meetings and correspondence that McCrossan considered this work as foundation fill and assumed it would be paid for this work under this bid item.

The FHWA has taken several different positions on this issue. Before we started the first foundation fill it was our understanding that FHWA was going to monitor and measure this particular area as foundation fill. After we completed repair area #2 we were told that the FHWA considered this as incidental work. We protested and asked to escalate this decision. As a result of this escalation, it was determined that the FHWA agreed with the quantities but they would pay for the work as Roadway Excavation instead of foundation fill. In an effort to keep the project moving we agreed to this partial payment but reserved our rights to pursue this issue as a claim.

In connection with this issue, FHWA retained Kumar and Associates as the Geotechnical Engineer to advise it on the construction of the foundation for Repair Areas #1 & #2. Kumar's memorandum dated 12/20/2000 confirms that this was in fact a foundation fill. This memo shows that the recompacted fill was done strictly to provide an acceptable foundation for the walls. We have attached a copy of that memo for your convenience.

The FHWA and McCrossan have agreed to the quantity of 14,924 m3 for this work. The only question concerns the basis of payment. The FHWA has paid for the work at the unit price for Roadway Excavation ($15.45), for a total of $230,560.35. McCrossan contends that this work was clearly a Foundation Fill not Roadway Excavation. The unit price for Foundation Fill is $24.29, which would generate a payment of $362,479.67. The amount of this claim would be the difference between the two sums, or $131,919.32.

3. Quarry Claim – The plans, specifications and the earthwork summary provided in the solicitation represented that the Contractor would be able to produce subbase and MSE wall backfill from the roadway excavation. This was consistent with the requirement of specification 205.06, which states: "Conserve suitable material for manufacturing (including crushing) select granular backfill material from the roadway excavation."

McCrossan mobilized crushing equipment and started crushing MSE wall backfill from roadway excavation in the spring of 2000. But when this material was tested it didn't meet the LA abrasion specification. Other areas of roadway excavation were crushed with similar results. This presented a secondary problem because the abrasion specification for the subbase material was the same as that for the wall backfill. As a result, FHWA advised McCrossan that we could not use the roadway excavation for subbase or MSE wall backfill.

In addition to the MSE wall backfill and subbase McCrossan bid the job to produce item 30101E, Aggregate Base Course, from the roadway excavation. Because the LA abrasion specification was the same for base course and subbase, McCrossan reasonably assumed the roadway excavation would also make base course. There were 10,500 M3 listed in the earthwork summary as waste excavation that became the property of the contractor. Based upon the contract indications, we bid the project to use this material to produce aggregate base course.

When the roadway excavation was not as represented, McCrossan incurred additional cost and time impacts associated with locating an alternative material source and disposing of the excess material. Essentially, for every yard of material from the Roadway Excavation that was not available for use as Base Course or Aggregate Base, McCrossan incurred the cost of excavating an equal volume of material from the alternative source.

There was a previously used quarry area within the project limits that we understood had previously produced specification quality material. We proposed that FHWA allow us to use this quarry site to make the aggregate products that were to otherwise come out of the roadway excavation. This proposal was designed to and actually did mitigate some of the resulting damage. Even though the FHWA agreed to this proposal we reserved our right to file claim due to this changed condition.

As confirmed by AMEC's cross-section of the quarry, 30,500 M3 were quarried to produce these aggregates. The 30,500 M3 of Roadway Excavation that would have been used to produce aggregate, now became excess material. This material was disposed of in numerous ways and in numerous locations. The disposal cost was much greater than the $2.45 bid for item 20412 Waste, but as a settlement offer, $2.45 per M3 has been used to calculate the additional cost of disposal.

The secondary and larger cost is the cost of developing, blasting and excavating the material from the quarry. McCrossan bid the job with the understanding that we were going to get paid $15.45 M3 to excavate this 30,500 M3 of Roadway Excavation, and $12.00 to $15.00 per ton for the aggregate it produced. Instead we had to excavate an additional 30,500 M3 from the quarry to make up for this 30,500 M3 that became waste. For purposes

of this settlement negotiation, we will assume that the cost of processing the excavated material from this alternative source was equal to what it would have been if the material had been processed from the Roadway Excavation, i.e. the $15.45 per M3 . If we are unable to resolve these issues at this stage, we believe our actual costs will be much higher.

Value $545,950.00

4. Curb Backfill -The project plans show a bituminous taper behind the guardrail. John Carver, the project C.O, deleted this taper. The guardrail had to be placed as soon as the subgrade was built and before any pavement was placed. This made it impractical to pave a taper behind the posts and rail at a later date. Mr. Carver's solution was to pave up to the front of the guardrail posts and eliminate the bituminous taper. At a later date the guardrail and the curb would be backfilled, which would eliminate the need for the taper. By the time McCrossan completed the backfill around the guardrail and the curb as directed, Mr. Carver had been removed from the project. Barbara Quintana, who was the C.O., denied payment for this work supposedly because the bituminous taper had not been placed. But Mr. Carver's direction was provided prior to Ms.Quintana's arrival on the project. In any event, the taper would have been covered by backfill material as per the typical section. The plan and specification clearly state that curb backfill will be paid for by the cubic meter. Approximately 1700 M3 of backfill was placed to backfill the guardrail and curb that were not paid for.

Value 1700 X $20.13 = $34,221.00

5. Topping Material-This project was in the mountains and by anybody's standard would be considered a rock job. On rock jobs plating of topping material is always at a premium. In section 204.04 of the SCR's three different paragraphs address the use of some sort of topping material. The first paragraph states that the asphalt pavement and base course will be saved to use as topping in rock cut areas. Paragraph 5 states that the contractor will conserve material meeting the specification for select topping material from roadway excavation to use for roadway topping. Paragraph 7 also states that the contractor will furnish and place aggregate base course as directed by the CO in rough and rocky subgrade areas.

On this project we milled the existing roadway and used it and the base course to carry traffic and plate rocky cuts. We conserved any material that was suitable to use as topping material. On a couple of occasions John Carver directed us to use aggregate base to plate

the roadway to facilitate traffic. Yet we still ran short of topping material. This project had over 60,000 m2 of roadway that was in rock cut areas. It generated over 20,000 m3 of over excavation. We used all available and suitable material to backfill and top these areas. But there simply were not enough quantities available.

As noted above, McCrossan produced subbase, MSE wall backfill and aggregate base on the project. These materials were produced by crushing and screening. These operations produced both prescreening and crusher fines. When we were out of material to plate the rock cut we were forced to use these processed products as topping material. Approximately 5,000 M3 of this material was used to top off the over-excavation areas. We asked for but never received payment for this item.

If in fact this processed material was not available and there was no acceptable topping material available from the excavation it is our opinion that the FHWA would have had to compensate us by change order or by using aggregate base to top out these rocky subgrade areas. Therefore we are asking fair market value for this material.

Value 5000 m3 X $6.00 = $30,000.00

6. <u>Controlled Blast Holes</u> – The solicitation contained very specific information outlining the cut areas and quantities, the spacing for the drill/blast holes, and designated whether those bore holes were to be horizontal or vertical. Those designations were used to calculate the original quantities for bid item 20502 Controlled Blast Hole (vertical) and 20503 Controlled Blast Hole (horizontal) of 28,000 M and 14,000 M, respectively.

During construction, McCrossan discovered that the designed cut areas and vertical blast holes were not as represented in the solicitation. Given the conditions in the field, McCrossan was required to use more horizontal drilling than originally represented. In fact, the horizontal quantities increased threefold. As your project personnel will confirm, this had a significant impact upon the logistics of completing the work as planned.

The horizontal drilling must be done from the middle of the existing roadway. The drill must occupy the middle of the road and drill horizontally into the adjacent rock cut. Any movement of haul trucks or related earthwork equipment was greatly impeded when they had to move through a horizontal drilling operation to get to the loading or dumping zone. We tried to schedule our operations to minimize this impact but the delays were unavoidable. With the ongoing wall excavation, roadway excavation, hauling of material to be processed at the crusher and the hauling of material to the pipe locations it became impossible to work around this problem.

Using the production and progress achieved in those areas not impacted by the excessive horizontal blasting, McCrossan has estimated that this increased the time required to complete the Project by no less than 100 days. This greatly increased the related overheads and other fixed costs and decreased McCrossan's efficiency.

For purposes of our settlement talks, we estimate that the threefold increase in quantities adversely impacted McCrossan's operational costs by no less than $305,000.

7. Compensable Delays – As of this date, FHWA has wrongfully withheld $475,000 from McCrossan's payment as liquidated damages. Given the issues raised herein, and the time impacts of these events and conditions, McCrossan clearly is entitled to additional contract time that would more than offset these liquidated damages.

The time impacts at issue clearly were not addressed in modification no. 2. That modification was negotiated in the fall of 2001 and there were several issues that arose or were ascertained subsequently that entitle McCrossan to additional performance time and compensation. These issues are explained in detail in McCrossan's letter of August 2, 2002. I have attached a copy for your convenience and will not restate our position. It provides a clear summary of the post-mod events that impacted our progress. For your information, FHWA never responded to this letter. Overall, it is our position that McCrossan is entitled to an additional 50 working days, from when the work was able to begin again in the fall 2002, due to issues and impacts that were discovered or ascertained after modification no. 2.

McCrossan estimates that its daily fixed costs related to this Project are $65,000 per month. This is consistent with the rates that FHWA paid for the prior delays. Given McCrossan's entitlement to 100 working days after work was able to resume, McCrossan is requesting the remission of all liquidated damages and $162,500.00 for the extended overhead.

8. Damage Summary—For settlement purposes, McCrossan is requesting payment of $2,568,247.57 and an extension of time necessary to abate the assessment of liquidated damages. These figures are submitted for settlement purposes only. If our talks are not productive, we will finalize our damage calculations and file formal claims requesting a final decision. We anticipate that those claims will be significantly higher than our settlement position. Also, our analysis does not account for the interest that is due. With a good faith effort on the part of FHWA to resolve and pay these issues timely, we will consider waiving interest as a component of our damages.

We look forward to our mutual efforts to bring these issues to resolution. Thank you for your prompt attention to this matter.

Sincerely,

Joseph McCrossan

**ATTACHMENT 3**

C.S. McCrossan, Inc.
100 South 76th Drive, Phoenix, Arizona 85043
Phone: 623/936-1486 • Fax: 623/936-4445

July 29, 2003

Mr. Randy Everett
Construction Operations Engineer
Federal Highway Administration
555 Zang Street, Room 259
Lakewood, CO 80228-1010

Subject: Project PFH 39-1(6), General Hitchcock Highway

Dear Mr. Everett:

C.S. McCrossan, Inc., hereby submits the following claim for additional compensation and the release of all liquidated damages in connection with work performed by McCrossan on Project PFH 39-1(6), (the "Project").

1. Earthwork Overrun - During construction, McCrossan experienced a substantial overrun in the quantity of work associated with pay item 20401 Roadway Excavation. McCrossan has not been compensated for the actual work performed in a timely manner and has incurred additional costs in its attempt to secure payment. Performance of the additional work also has required additional time to complete the Project. Significant impacts to the planned method and sequence of construction resulted as a direct consequence of these changed conditions. It should be noted that neither McCrossan nor the Engineer was in a position to determine the actual excavation quantities until completion.

Upon completion, the FHWA instructed McCrossan to commission a field survey to determine how much excavation had actually been done. McCrossan retained AMEC to perform the survey. After they had done some of the work and generated some quantities, AMEC personnel met with the FHWA to explain their methodology. The FHWA had concerns about the quantities so they hired RS Engineering to check AMEC's work. AMEC and RS have now agreed on a cross section measurement of 186,600 M3 for the areas that were actually surveyed and cross-sectioned. However, an additional 38,287 M3 of excavation must be added to the cross section total for excavation areas not previously included. These areas include the cross roads, the foundation fills at the repair sites #1 & #2, and the .5' sub cut in the rock cut areas of the subgrade. Adding these additional quantities to AMEC's cross-section quantities generates a total quantity of 214,887 M3. FP 96 clearly confirms that these excavation areas should be measured and paid as additional roadway excavation. This would bring the total roadway excavation to approximately

aggregate base to plate the roadway to facilitate traffic. Yet we still ran short of topping material. This project had over 60,000 m2 of roadway that was in rock cut areas. At six inches of subgrade excavation and prepartion10,000 m3 of additional excavation is generated. McCrossan believes that it should be compensated for this work at the Contract unit price for Roadway Excavation. We used all available and suitable material to backfill and top these areas. But there simply was not enough material available.

As noted above, McCrossan produced subbase, MSE wall backfill and aggregate base on the project. These materials were produced by crushing and screening. These operations produced both prescreening and crusher fines. When we were out of material to plate the rock cut we were forced to use these processed products as topping material. Approximately 5,000 M3 of this material was used to top off the over-excavation areas. We asked for but never received payment for this item.

If in fact this processed material was not available and there was no acceptable topping material available from the excavation it is our opinion that the FHWA would have had to compensate us by change order or by using aggregate base to top out these rocky subgrade areas. Therefore we are asking for what we believe to be fair market value for this material.

Value 5000 m3 X $6.00 = $30,000.00

**6.** <u>Compensable Delays</u> - As of this date, FHWA has withheld $475,000 from McCrossan as liquidated damages. McCrossan believes that FHWA has violated the terms and conditions of the Contract by assessing liquidated damages given McCrossan's entitlement to adjustments in contract time for the numerous changed conditions affecting the project. Despite our requests, FHWA has not provided any written explanation as to how the contract time was calculated to arrive at this assessment. Given the issues raised herein, and the time impacts of these events and conditions, McCrossan clearly is entitled to additional contract time that would more than offset these liquidated damages and result in additional payment for the extended general conditions.

The time impacts referenced herein were not addressed in Modification No. 2. That Modification was negotiated in the summer and signed in the fall of 2001. There were several issues that arose or were ascertained subsequently that entitle McCrossan to additional performance time and compensation. These issues are explained in detail in McCrossan's letter of August 2, 2002. I have attached a copy for your convenience. It is important to note that this letter was never answered yet the FHWA continued to withhold liquidated damages.

Per the terms of Modification No. 2, McCrossan resolved only certain time related issues. We reserved the right to claim for matters that were ascertained after the Modification became effective. At that time, neither party was aware of the significant overrun in the

earthwork and consequently the full impacts of the unsuitability of the roadway excavation for use as aggregates, the final overrun of horizontal drilling and their impact upon the project.

After the execution of Modification No. 2, weather impacted several aspects of the asphalt placement and construction of various concrete structures. Our time calculations in Modification No. 2 assumed that the weather would not impact our operations. We agreed that we would be given additional contract time to account for delays resulting from weather related delays.

In addition to the post-modification weather impacts, McCrossan also lost critical time due to extra work performed at the direction of FHWA including, but not limited to, modified slope construction to address dangerous conditions caused by unexpected geological conditions. Also, the differing site conditions at the San Pedro cut resulted in additional excavation performed under very difficult conditions due to the limited work area and the need to carry traffic. The conditions under which the additional excavation had to be performed led to significant lost efficiency and additional time. We believe all of these impacted McCrossan's operations subsequent to the execution of Modification No. 2 and entitle McCrossan to no less than 100 additional working days as well as additional compensation.

The San Pedro cut and the manner in which the related changed conditions were handled by the FHWA is the most significant impact to the project subsequent to the signing of Modification No. 2. The San Pedro cut was the last roadway cut left on the upper project. From 9/12/01 to 10/04/01 several small blasts were set off at San Pedro. These blasts were used to build an access road so that drilling equipment could get to the top of the cut. After the road was pioneered, Bob Cummings (Blasting Consultant) came to the site on 10/08/01 to measure and photograph the site so that he could develop a blasting plan. On 10/09/01 Jerry James, our Project Manager, received a memo and a blasting plan from Mr. Cummings. This memo expressed his concern that even though the left side of the cut was not intended to be excavated it was unsafe and should be laid back. FHWA did not accept Mr. Cumming's opinion. Accordingly, we continued with the blasting, excavating and pioneering through October and early November. On November 20th McCrossan again told the FHWA that we felt the left side of the cut at San Pedro was dangerous and that they should look at it. Mr. Cummings was on the job that day and he was asked by the FHWA to look at the cut. He reiterated his opinion that he had expressed in his 10/09/01 memo that yes, it was dangerous.

On 11/21/01, Mr. Cummings sent a memo confirming his concerns about the safety of the cut. He also suggested an excavation method that would enable us to remove the material on the left and keep traffic flowing. On 11/28/01, the FHWA requested that the blasting consultant review the cut on the right side of the roadway at San Pedro. On 11/29/01, Mr. Cummings was on site to review and make recommendations as how we should proceed with the cut. On 12/12/01 we received his recommendation and passed it on to the FHWA. Still no decision was made as to how the FHWA wanted us to handle this changed and unexpected geological condition. Almost a month later (1/09/02), Mr. Cummings was asked

to visit the site and meet with the FHWA geotechnical representative, Mr. Khamis Haramy, and review the cut one more time. The next day Mr. Cummings sent us a memo with the suggestions he and Khamis Haramy had agreed upon. We were now able to go ahead with our work. Although the blasting and excavation was weather impacted, it was completed by the end of January. The subbase, base course and first lift of asphalt was placed by the 14th of February.

Given the unexpected geological site conditions discovered at San Pedro, if FHWA had timely considered and followed Mr. Cummings' suggestion to remove the slide area on left side of the San Pedro cut, the Project would not have been delayed by over a month. In addition to this delay, there was extra work performed and time lost to effectuate the FHWA's directives in this area to lay back the slopes on the left and right sides of the roadway. McCrossan's analysis indicates that, at a minimum, these issues delayed completion by 50 days.

In addition to this impact there were several other impacts for which additional time should have been granted. When we signed Modification No. 2, the earthwork summary showed that the upper job should balance or possibly be somewhat short as far as the embankment material needed and excavation material available. As it turned out, we generated over 6,000 m3 of excess material, excluding San Pedro, that had to be dealt with. This excess was wasted by changing grades, flattening slopes and disposing of over 3,000 m3 at the helipad site. This unforeseen differing site condition caused additional delays and additional expense.

Per the plans and specifications, McCrossan was to construct a containment berm and a turnout at Sollars Road, which is directly across from the quarry site. The berm and the turnout were constructed as per the plan and specification. Later, FHWA changed the configuration of the berm and the grade and alignment of the turnout. These changes delayed the paving through the quarry area.

Other changes such as armour plating ditches, extending and relocating rundowns, extending guardrail, adding end treatments and other changes also added to the delays. These issues may seem minor but given the strict interpretation of the language of Modification No. 2 they become significant.

In addition to the items affecting Contract completion discussed above, McCrossan believes that FHWA should consider that we were forced to endure an ever-changing Administration Team for FHWA at the project level. The constant changes in personnel assigned to the project made it very difficult, if not impossible, to maintain any continuity of communication. This circumstance certainly did not serve the interests of either party.

When reviewing the time of completion, FHWA also should consider the fact that the specific language of Modification No. 2 allows for adjustments in Contract Time if weather

214,887 M3. To date, FHWA has only paid for 172,484 M3 at $15.45/M3 for a total payment of $2,664,887.80. The quantity of 214,887 M3 would generate a payment of $3,320,004.15. The difference is $655,126.35. In addition to this amount, FHWA also owes approximately $71,179 for waste related activities. As originally designed by FHWA, the project would have generated a surplus of excavated material. Contract Line Item 20402, "Waste", was established to compensate the Contractor for disposing of the excess material. With the substantial overrun in the volume of excavation, the quantity of waste also increased proportionately. In order to dispose of the increased waste, McCrossan was forced to haul a great deal of the excavation off of the project to the area known as the "Horseshoe". Once the material was placed in that area, FHWA directed that it be placed in a manner that was acceptable to the Forest Service. This required crushing a portion of the material down to a size that made it suitable for plating the disposal site. The extra work required to crush the additional waste material would not have been necessary if not for the changed conditions, 35% increase in the estimated quantities associated with the earthwork balance, and the misrepresentation in the bid documents concerning the suitability of the Roadway Excavation for the production of aggregates.

In order to place a value on this portion of the claim we have broken it down into two parts, (1) crushing of the material and (2) hauling and grading of the approximate quantity of Waste taken to the Horseshoe site. Given the nature of these two impacts, we do not have specific cost data tracking all aspects of these impacts. We estimated the actual impacts using 15 working days of activity with 1 crew member and an equipment complement of 1 track-mounted jaw crusher and 1 six cubic yard loader that was actually used to perform this work. The 15 days is based upon an estimate of the actual time that was required to complete this work.

| | |
|---|---|
| Crushing: Estimated Cost ~ | $22,179.00 |
| Hauling & Placing ~ 20, 000 m3 Waste @ $2.45 = | $49,000.00 |

For point of reference, when you consider the combined operations of the Roadway Excavation and the Waste activities, the actual cost increases for the affected activities approximates the amounts due using the unit bid prices and the actual quantities.

Therefore, McCrossan is entitled to an additional payment of $726,305.35 due for the increased quantities for these line items.

2. Foundation Fill-As bid, the project included two sections to reconstruct and two sections that were known as repair areas #1 & #2. The reconstruction areas were from stations 15+300 to 18+290. This was identified as the "lower section" since it was at a lower elevation than the other reconstruction section. The section known as the "upper section" was located from station 25+660 to 33+500. Repair section #1 was located within the lower section at station 16+000. Repair area #2 was located between the lower section and the upper section at station 20+660 to station 20+960.

Both of the repair areas had been previously flooded and the roadways had been washed out. The emergency repair consisted of loosely dumped fill of large rocks and earthen material and temporary pavement to facilitate traffic. The reconstruction of these repair areas was to be accomplished by using MSE walls to contain the roadway embankment rather than earthen fill slopes. The previously constructed emergency fill was considered to be an unacceptable foundation for the MSE wall and was to be removed and recompacted per the plans.

FHWA's plans tabled and quantified some of the potential foundation fill areas. Repair areas #1 & #2 were not included on this table. The FHWA has cited this omission as somehow supporting its position that this work was not a foundation fill. But this position ignores the language of the SCR's (page I-67, section 208.04), which states: "Location of foundation fill shown on the plans are for contingency. Actual locations and quantities will be determined by the CO."

It is well documented in partnering meetings and correspondence that McCrossan considered this work as foundation fill and assumed it would be paid for this work under this bid item.

The FHWA has taken several different positions on this issue. Before we started the first foundation fill it was our understanding that FHWA was going to monitor and measure this particular area as foundation fill. After we completed repair area #2 we were told that the FHWA considered this as incidental work. We protested and asked to escalate this decision. As a result of this escalation, it was determined that the FHWA agreed with the quantities but they would pay for the work as Roadway Excavation instead of foundation fill. In an effort to keep the project moving we agreed to this partial payment but reserved our rights to pursue this issue as a claim.

In connection with this issue, FHWA retained Kumar and Associates as the Geotechnical Engineer to advise it on the construction of the foundation for Repair Areas #1 & #2. Kumar's memorandum dated 12/20/2000 confirms that this was in fact a foundation fill. This memo shows that the recompacted fill was done strictly to provide an acceptable foundation for the walls. We have attached a copy of that memo for your convenience.

The FHWA and McCrossan have agreed to the quantity of 14,924 m3 for this work. The only question concerns the basis of payment. The FHWA has paid for the work at the unit price for Roadway Excavation ($15.45), for a total of $230,575.80. McCrossan contends that this work was clearly a Foundation Fill not Roadway Excavation. The unit price for Foundation Fill is $24.29, which would generate a payment of $362,503.96. The amount of this claim would be the difference between the two sums, or $131,928.16.

3. Quarry Claim - The plans, specifications and the earthwork summary provided in the solicitation represented that the Contractor would be able to produce subbase and MSE wall backfill from the roadway excavation. This was consistent with the requirement of

specification 205.06, which states: "Conserve suitable material for manufacturing (including crushing) select granular backfill material from the roadway excavation."

McCrossan mobilized crushing equipment and started crushing MSE wall backfill from roadway excavation in the spring of 2000. But when this material was tested it did not meet the minimum Contract requirements for resistance to wear as determined by LA abrasion test. Other areas of roadway excavation were crushed with similar results. This presented a secondary problem because the abrasion specification for the roadway subbase material was the same as that for the wall backfill. As a result, FHWA advised McCrossan that we could not use the roadway excavation for roadway subbase or MSE wall backfill.

In addition to the MSE wall backfill and subbase, McCrossan bid the job to produce item 30101E, Aggregate Base Course, from the roadway excavation. Because the LA abrasion specification was the same for base course and subbase, McCrossan reasonably assumed the roadway excavation would also make base course. The Earthwork Summary Table contained within the Bid Documents listed 10,500 meters as Waste. The Waste material was designated to become the property of the Contractor. McCrossan logically concluded from the Bid Documents that the Waste material would be as represented, and therefore, would be suitable for the production of aggregates that met the contract requirements. McCrossan based its bid on these indications by the Owner in the Bid Documents.

When the roadway excavation was not as represented, McCrossan incurred additional cost and time impacts associated with locating an alternative material source and disposing of the excess material. Essentially, for every yard of material from the Roadway Excavation that was not available for use as Base Course, Aggregate Base or MSE wall backfill, McCrossan incurred the cost of excavating an equal volume of material from the alternative source.

As you are aware, there was an area within the project limits that had been used previously for the quarrying of materials used to produce aggregates. This area was not made available to the bidders in the Bid Documents. We later learned that the materials previously produced from this source met the quality requirements for the current Contract. We proposed that FHWA allow us to use this quarry site to make the aggregate products that were to otherwise come out of the roadway excavation. McCrossan believes that this proposal served to mitigate some of the time and cost impacts that would have been incurred due to the Changed Condition if this option had not been pursued. Even though the FHWA agreed to this proposal, McCrossan never waived its right to be compensated for time and cost impacts that resulted as a consequence of this differing site condition.

As confirmed by AMEC's cross-section of the quarry, McCrossan was forced to excavate 30,935 M3 to produce the necessary aggregates. This excavation involved equipment and methods similar to those used to perform the work associated with the Contract Line Item for Roadway Excavation. In pricing this aspect of its claim McCrossan has treated the Excavation at the quarry and the additional waste as extensions of the respective Contract

Line Items. McCrossan is requesting payment of $477,945.75 for this aspect of the work (30,935 @ $15.45).

In addition, the 30,935 M3 of Roadway Excavation that would have been used to produce acceptable aggregate, now became excess material. This material was disposed of in numerous ways and in numerous locations. Despite the fact that the disposal cost was much greater than the $2.45 bid for item 20412 Waste, McCrossan requests that it be paid for these quantities at the Contract Bid price of $2.45 per cubic meter for a total of $75,790.75.

The total value of this claim is $553,736.50

4. Curb Backfill -The project plans show a bituminous taper behind the guardrail. John Carver, the project C.O, deleted this taper. The guardrail had to be placed as soon as the subgrade was built and before any pavement was placed. This made it impractical to pave a taper behind the posts and rail at a later date. Mr. Carver's solution was to pave up to the front of the guardrail posts and eliminate the bituminous taper. At a later date the guardrail and the curb would be backfilled, which would eliminate the need for the taper. By the time McCrossan completed the backfill around the guardrail and the curb as directed, Mr. Carver had been removed from the project. Barbara Quintana, who was the C.O., denied payment for this work supposedly because the bituminous taper had not been placed. But Mr. Carver's direction was provided prior to Ms.Quintana's arrival on the project. In any event, the taper would have been covered by backfill material as per the typical section. The plan and specification clearly state that curb backfill will be paid for by the cubic meter. Approximately 1700 M3 of Curb Backfill was placed to backfill the guardrail and curb that has not been paid for.

Value 1700 X $20.13 = $34,221.00

5. Topping Material-This project was in the mountains and by anybody's standard would be considered a rock job. On projects involving rock excavation, plating of the top portion of the subgrade with finer material in order to facilitate finishing of topping material is most always desirable. In section 204.04 of the SCR's three different paragraphs address the use of some sort of topping material. The first paragraph states that the asphalt pavement and base course will be saved to use as topping in rock cut areas. Paragraph 5 states that the contractor will conserve material meeting the specification for select topping material from roadway excavation to use for roadway topping. Paragraph 7 also states that the contractor will furnish and place aggregate base course as directed by the CO in rough and rocky subgrade areas.

On this project we milled the existing roadway and used it along with the existing base course to carry traffic and plate rocky cuts. We conserved any material that was suitable to use as topping material. On a couple of occasions John Carver directed us to use

affects the productivity of critical activities such as paving. McCrossan believes that this was exactly the case, and as such it is entitled to an adjustment of Contract Time.

The FHWA's time calculations also have failed to account for the fact that McCrossan had placed a minimum of 1 mat of pavement by February 14 and had obtained substantial completion per our discussions prior to signing Modification No. 2 and our interpretation of the language of the Modification. Despite that fact, it appears that FHWA has started charging McCrossan liquidated damages even though the work was stopped on February 14, 2002 due to the owl/falcon restrictions. Given the compensable delays after Modification No. 2 referenced above, it is not only improper to assess liquidated damages for falcon restrictions during the 2002, but that shut down is itself compensable.

It is our position that FHWA's directive that McCrossan suspend operations in February 2002 amounts to a change, an act of interference with our operations, and a breach of FHWA's duty to cooperate. As of that time, it is our understanding that the subject birds were not even protected species. Accordingly, FHWA had an affirmative obligation to take the steps necessary to allow McCrossan to continue working on the project. Its failure to do so renders the directive to suspend operations compensable.

The owl/falcon restriction lasted from February 14 through May 31, 2002. The fires then delayed the project until July. Once we started work in July 2002, FHWA made numerous changes that added additional work. We estimate that this delayed our final completion by 50 days.

Overall, it is our position that McCrossan is entitled to an additional 150 working days for the significant amount of additional work associated with the substantial overruns in Roadway Excavation, Waste and Horizontal Drilling, the post-Modification impacts from inclement weather, the changed conditions at the San Pedro cut, and the numerous changes and additions to the work performed after we were allowed to return to the project following the Forest fires that took place in 2002. McCrossan estimates that its fixed costs related to this Project are $43,601 per month. Given McCrossan's entitlement to 150 working days subsequent to the signing of Modification No. 2, McCrossan is requesting the remission of all liquidated damages and compensation of $327,010.00 for its extended overhead.

**7.** Based upon the foregoing, McCrossan hereby demands that the FHWA immediately pay McCrossan ***$2,278,201.01 plus*** the appropriate amount of interest and an extension of time necessary to abate the liquidated damages.

McCrossan respectfully request that you issue a final decision on this claim. The undersigned certifies that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which McCrossan believes the government is liable. I am authorized to certify this claim on behalf of McCrossan.

If you have any questions or comments regarding this matter, please contact my office at 623-936-1486.

Sincerely,

Joseph McCrossan

**ATTACHMENT 4**

C. S. McCrossan Construction, Inc.
General Contractors
Box 1717 • Las Cruces, New Mexico 88004 • 505/523-2686 • FAX 505/525-2492

August 10, 2004

Mr. Randy Everett
Contracting Officer
U. S. Department of Transportation
Federal Highway Administration
Central Federal Lands Highway Division
555 Zang Street # 259
Lakewood, CO 80228

RE: CONTRACT DTFH68-00-C-00010 GENERAL HITCHCOCK HIGHWAY (Mt Lemmon)

Dear Mr. Everett:

As we have previously advised FHWA, C. S. McCrossan, Inc. has been analyzing the additional costs associated with the 300% quantity overrun for horizontal drilling that we experienced on this project. McCrossan hereby requests a change order in the amount of $1,281,250.22 pursuant to the Changes and Variations in Quantities clauses of the contract.

To complete this work, McCrossan was forced to utilize horizontal drilling in those areas where vertically drilled holes were otherwise contemplated by the plans. The Contract included line items for payment of each method of drilling by the linear meter. The Contract unit prices for those line items were $11.94 for vertical and $14.37 for horizontal blast holes. FHWA's measurement and payment of the horizontal blast holes at the higher unit price confirms its concurrence with the method used for each blast.

In addition to our discussions regarding the other outstanding claim issues on the project, we have spent the last several months attempting to analyze the various impacts that the horizontal blast hole overrun had on our operations and costs. The costs were felt predominantly in McCrossan's production cost of roadway excavation. We ultimately decided that using a measured mile was the most appropriate way to examine the impacts.

Obviously there are critical differences between vertical and horizontal blast holes. The difference is exacerbated by unknown geological conditions discovered after the various blasts. In general, vertical drilling leaves a truer face, which greatly reduced the post-blast scaling that McCrossan was required to perform by FHWA. Horizontal blasting leaves large overhangs and many loose boulders in the face. These overhangs and boulders had to be scaled with track hoes and breakers to ensure a safe slope surface. Many of these large boulders had to be later broken by track hoes and breakers to be placed in fills.

Blasts using vertical holes and charge time delays tend to cause the excavated material to rise and then settle on the shoulder of the roadway. Horizontal shots cause the material to move latterly across the road and down the adjacent slope. Horizontal shots also cause a greater amount of fly-rock. In an effort to reduce fly-rock and facilitate the removal of the excavated material, horizontal shots are normally loaded with a lighter powder factor, which again leads to larger size material that has to be broken later to meet fill requirements. In general, horizontal blast holes require more labor and equipment and generates less volume of material in a given time as compared to vertical holes. Essentially, with the same, and sometimes greater equipment requirements, for a particular area, the daily excavation quantities goes down with the use of horizontal blast holes and the costs increase. The net result is an increased unit cost of excavation.

Additionally, horizontal drilling increased traffic congestion in certain circumstances and required increased survey costs. The horizontal holes had to be surveyed as to location and depth of hole to try to prevent overbreak.

To determine the impacts upon on the Roadway Excavation unit costs, we had to determine if there was an area where the ratio of vertical to horizontal drilling was reasonably consistent with the quantities indicated by FHWA in the Contract Documents. We believe the period from 1 April 2000 to 1 September 2000 is a representative baseline for this calculation. During this time, there were 89 roadway production shots and the FHWA measured and paid for 44,678 cubic meters of excavation. This would equate to approximately 500 cubic meters per shot. The FHWA measured and paid for 5763 meters of vertical blast holes and 2742 meters of horizontal blast holes during this time span. This ratio of vertical to horizontal is almost identical to the bid quantities and the assumptions the FHWA made in calculating these anticipated quantities. During this base period, McCrossan's actual roadway excavation costs was $ 9.79 per cubic meter.

We then performed the same calculations for the time period from 2 September 2000 to 1 March 2002. During this time frame there were 277 roadway production shots. The blasting related excavation quantity was approximately 104,800 cubic meters. This would equate to approximately 380 cubic meters per shot. I would note that the FHWA paid for approximately 128,000 cubic meters of roadway excavation during this time frame but 22,900 cubic meters were not related to blasting (the two repair sites and the slope slide at Sycamore Canyon). For the blast quantities, the FHWA measured and paid for 2,766 meters of vertical blast holes and 40,015 meters for horizontal. Based on the ratio of vertical to horizontal blast holes in the bid schedule the anticipated quantity of

horizontal holes should have been approximately 9,250 meters and the anticipated quantity of vertical holes should have been 18,500 meters. Focusing solely on this particular time period, the increase was actually 430%. And McCrossan's actual production costs for this amount of excavation was $21.55 per cubic meter.

The difference between the unit cost of blasting related excavation performed for that portion of the project where the ratio of the two drilling methods was consistent with the quantities in the Contract versus that portion where there was a large overrun of horizontal drilling is $11.76 per cubic meter. To perform this calculation and create an apples to apples comparison of these two time frames McCrossan has reduced the cost of the roadway excavation by $353,805 to take into consideration the non blasting related roadway excavation. The sum of $353,805 was arrived at by multiplying the 22,900 cubic meters of non blasting related excavation by the bid unit of $15.45. We also reduced the roadway excavation cost by the amount of the "quarry claim" ($545,950.00) and the amount of "waste and crushing claim" at the Horseshoe ($82,000.00).

The Variation in Quantities clause allows for a 15% overrun or underrun without a price adjustment. Therefore the quantity 104,800 cubic meters of affected excavation would be reduced to 89,150 cubic meters.

McCrossan believes that the increased production costs of the roadway excavation due to the 28,125 meters increase in horizontal drill holes reflects a defect in the original bid documents and thus a constructive change, a latent physical condition at the project site under the differing site conditions clause, and at a minimum a material and compensable increase in the estimated quantities and the related impacts to our costs. Based on the analysis of unit costs for excavation discussed above, McCrossan hereby requests an adjustment to its Contract of $1,281,250.22 (89,150 x $11.76) plus 10 % overhead, 10 % profit and 1 % bond.

We intend to discuss this matter with FHWA at the Settlement Conference on August 13. In the meantime, if you have any questions or comments concerning this issue, we will be happy to discuss them with you by telephone.

**McCrossan respectfully request that you issue a final decision on this claim. The undersigned certifies that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which McCrossan believes the government is liable. I am authorized to certify this claim on behalf of McCrossan.**

Sincerely,

Charles Gaasland

C.S. McCrossan Construction, Inc.
General Contractors
Box 1717 • Las Cruces, New Mexico 88004 • 505/523-2686 • FAX 505/525-2492

August 2, 2002

Mr. James Klamerus
Contracting Officer
Federal Highway Administration
Central Federal Lands Highway Division
555 Zang Street, Room 259
Lakewood, CO 80228

RE: Arizona Forest Highway Project PFH 39-1(6) General Hitchcock Highway

Dear Mr. Klamerus:

As you are aware, we have been reviewing the file for this contract and identifying all issues that will need to be resolved prior to contract closeout. The outstanding issues have been the subject of various correspondence and discussions throughout the project.

With this correspondence we would like to state for the record that C.S. McCrossan, Inc., disputes FHWA's withholding of progress payments for liquidated damages. We believe that FHWA has incorrectly interpreted the language of Contract Modification SA0002 and failed to account for the conditions and events that transpired after the modification. In short, FHWA is not justified in assessing any liquidated damages.

By its terms, the modification did not account for or include any delays that were experienced or discovered after execution. In addition, the modification clearly contemplates that we will be given additional time for weather impacts to the project. It is our clear position that McCrossan diligently pursued all available work given temperature limitations until the Owl and Falcon restrictions and the recent fires halted construction. Absent the weather impacts and other progress delaying events beyond our control, the bird restrictions would not have been a problem since the completion of those activities referenced in the modification would have been finished prior to the onset of the restrictions. It should be noted that because the original delays were not caused by the contractor, these subsequent delays are compensable.

As you are well aware, McCrossan negotiated Modification No. 2 with FHWA's constant threat of default, including two references within the language of the modification. Nonetheless, McCrossan had the clear understanding that, at a minimum,

the modification preserved McCrossan's right to assert claims regarding conditions, events, and impacts discovered after the modification and the weather impacts. Those impacts which FHWA has been aware of for some time, include, but are not limited to, a significant overrun in the excavation quantities and the misrepresentation in the Contract of the suitability of the excavated materials for use as subbase and wall backfill. Both of these changed conditions created material impacts to the project schedule and cost by substantially increasing the total volume of excess material that needed to be disposed of. None of these issues and related impacts were resolved or released in the modification.

In addition, the modification extends the contract completion by the 100 days that McCrossan requested eight months before the date of the modification. Only an additional 29 days for the spotted owl issues were granted. We also would note that this time was lost during prime construction weather and the additional time was granted during a time when weather could be a very real factor affecting progress.

As you can tell from our schedule that formed the basis of the modification, we were forced to assume that the weather would be suitable. As confirmed by the terms of the modification, it was our understanding (and still is) that weather related delays were going to extend the contract so it made no sense to speculate about the impact of bad weather.

McCrossan understands that the modification states that the time granted is to be considered full consideration for all time impacts and delays experienced as of a result of the conditions noted therein. But the modification also preserves McCrossan's rights under the contract for events, acts, or conditions arising or discovered after this modification. Therefore, the impact of the weather, unknown to all parties at the time the modification was signed, must now be taken into consideration.

For example, the modification references paving, placement of concrete curb and seeding or landscaping as weather related items. It was McCrossan's intention that these were listed as examples of the critical items at that time. It is obvious that the FHWA understood that there were other items that were weather related and items that simply followed these weather-related items. For example, we could not backfill the curb until it was placed. We could not do the final adjustment to the guardrail until the final mat had been placed. We could not place the embankment curb on top of the final mat until we had placed the final mat. We could not backfill the embankment curb until we had placed it. Other items such as sidewalk and cast in place concrete structures were controlled by temperature for placement. In addition, after the modification, the FHWA required additional work due to the discovery of unstable geological conditions, which led to design changes, delays, and a re-sequencing of planned activities. No time consideration has yet been given for these changes and delays.

As you know, we unexpectedly encountered two unstable geological conditions where the slope slide at station 30+600 and at the rock cut at San Pedro. With regard to the cut at San Pedro the consensus was that if the roadway was built per design, that it would have

created a condition that was potentially dangerous to the travelling public. The San Pedro cut, unlike most other cuts on the job, involved a rock cut on both sides of the road from 27+800 to 28+300. When the cut on the right side of the roadway was completed we were ready to proceed with the cut on the left side of the roadway. McCrossan brought it to the FHWA's attention that the rock formation on the left appeared to be unstable with some dangerous looking fault lines. Given the potentially hazardous condition at the San Pedro cut, FHWA told us not to proceed until their geologist looked at the condition. It took approximately five weeks to receive FHWA's decision instructing us how to proceed and to complete the excavation as proscribed. The decision was to move the cut area back behind the fault area to insure a safer slope. This had a two-fold effect as to additional cost and time.

The fact that there was a rock slope on both sides of the roadway caused a bottleneck effect. The excavated material would plug the narrow roadway and had to be moved up station or down station to allow traffic to flow. This material was later double handled for placement. As mentioned previously, any additional excavation created additional waste that was not anticipated in the mass balance calculations that were provided as part of the Contract. At this stage of the project, there were no fills remaining to be constructed, leaving no place to dispose of the excess excavation. A bilateral agreement was reached to raise the grade through San Pedro to dispose of this waste. To do this the fill had to be constructed in multiple stages, rotating between the left and right sides of the roadway in shallow lifts in order to facilitate uninterrupted traffic flow through the bottleneck as the grade was raised up to eight feet in elevation. This added additional time and cost to the completion of this section of roadway.

Also, there can be no question that the addition of approximately 8,000 m3 of excavation at the slope slide at station 30+600 prevented previously scheduled work in this area from being completed and redirected our workforce away from other scheduled work.

With all of these conditions and problems discovered after the modification, it was critical that FHWA provide immediate direction so as to minimize the delays. But during this critical time period, McCrossan was faced with a revolving door with regard to the FHWA's project management. The FHWA's upper level project management changed several times during the project. The net effect was that discretionary work such as finished slopes, rock scaling and other items accepted by one person would be changed later by that person's replacement. The total impact of this problem is unknown to this date.

It is entirely improper for the FHWA to assess liquidated damages without properly considering the work remaining at the time the modification was negotiated, the terms of the modification, McCrossan's intentions in agreeing to those terms, the geological changed conditions, and the weather and sequence controlled activities.

Please consider this correspondence as our formal protest of the withholding of payments for the purpose of assessing liquidated damages. They simply are not justified given the

scope of the modification, changes in the work, and the excusable and compensable delays and changed conditions encountered to date. If FHWA releases contract funds within the next 30 days, McCrossan will waive interest. Otherwise, we will have no choice but to escalate this issue through the partnering process and, if unresolved after that, we will file a formal claim requesting a contracting officer's decision.

We look forward to your prompt response.

Sincerely,

Charles A. Gaasland
Vice President